STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
LOUIS SOUSS, DEFENDANT-APPELLANT.

Argued May 20, 1974—Decided August 6, 1974.

454

&#x2014;&#x2013;30

Mr. *Paul Alongi* argued the cause for defendant-appellant (*Messrs. Alongi, Bregg & DeVito,* attorneys; *Mr. Alongi* and *Mr. Francis M. DeVito* on the brief).

Mr. *John A. Matthews, III* and Mr. *R. Benjamin Cohen,* Assistant Prosecutors, argued the cause for plaintiff-respondent (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney; *Mr. Matthews, Ms. Sara A. Friedman* and *Mr.*

*Steven Jay Greenstein,* Assistant Prosecutors, on the brief; *Mr. Cohen,* of counsel).

The opinion of the Court was delivered by

CLIFFORD, J. The sole issue raised by this appeal is the propriety of concurrent custodial sentences imposed on defendant after a guilty plea to charges of bookmaking and unlawful possession of lottery slips in violation of *N. J. S. A.* 2A:112–3 and *N. J. S. A.* 2A:121–3(b) respectively. The Appellate Division approved the sentences in an unreported opinion and this Court granted certification. We affirm.

Preliminarily we observe that this is not the occasion for an in-depth exploration of possible alternatives to or revision of our sentencing practices. See *State v. DeStasio,* 49 *N. J.* 247 (1967) and *State v. Velasquez,* 104 *N. J. Super.* 578 (App. Div.), aff'd 54 *N. J.* 493 (1969), and particularly the authorities referred to in Justice Jacobs' concurring opinions in those cases, 49 *N. J.* at 261–262 and 54 *N. J.* at 493–495. The record presented to us is entirely insufficient for a profitable excursion in that direction and we leave it for another day. Our review is limited to the question of whether the sentencing judge abused his discretion, *e. g., State v. Tyson,* 43 *N. J.* 411, 417 (1964), *cert.* denied, 380 *U. S.* 987, 85 S. Ct. 1359, 14 *L. Ed.* 2d 279 (1965), in imposing a 1 to 2 year term in New Jersey State Prison and a fine of $1000 on the bookmaking charge and a concurrent 1 to 2 year term on the unlawful possession of lottery slips count.

Defendant was charged in six counts of an indictment which contained over seventy counts. Souss and twenty-three of the other defendants commenced trial. After about five weeks of trial Judge Handler accepted this defendant's guilty pleas to the two counts aforementioned; the remaining counts charging Souss with conspiracy, working for a lottery, and maintaining premises for gambling and bookmaking were dismissed. Thereafter, Judge Giuliano, then Assignment Judge of Essex County, imposed sentence pur-

suant to this Court's administrative directive that all gambling sentences be imposed by one judge in the county.

The papers before us include the presentence report and transcript of sentencing. From them and from supplemental information acquired at oral argument we learn that defendant's arrest came about as the result of an intensive electronic surveillance investigation, forming the basis for search warrants, carried out by the Essex County Prosecutor's Office in conjunction with the Hudson, Union and Morris County Prosecutors' Offices and some municipal police departments. Armed with those warrants the authorities conducted simultaneous raids upon about thirty premises in north Jersey. Included was the house of Louis and Yolanda Souss[1] in Belleville, where members of the Essex County Prosecutor's Office confiscated several papers, notebooks related to gambling, a racing program and $215 in cash wrapped in a series of paper slips "with notations relating."

Defendant directs our attention to those parts of the record which disclose that he has no prior criminal record; that at the time of sentencing he was 60 years of age and had been steadily employed by I. T. & T. for the last 32 years; that his wife suffers from arteriosclerosis and experiences angina pain; and that the couple lost one son in childbirth and thereafter adopted a baby boy. He asserts that he was only a "player" — a frequent contention in cases of this type but one clearly at odds with defendant's plea to bookmaking — and that he was not involved with organized crime. It is substantially on the basis of this information that Souss argues for probation from the custodial sentences imposed, not simply a reduction therein inasmuch as *N. J. S. A.* 2A:112–3 requires a minimum term of one year.

Specifically, defendant charges that the sentencing judge "misunderstood the mandates" of *State v. Ivan,* 33 *N. J.*

---

[1]Although arrested Mrs. Souss was not indicted by the grand jury.

197 (1960), as a result of which probation was "automatically denied" due to a "hasty allegation [by the court] that this man was associated with one of the largest syndicated operations in the county." His brief contains the concession that if that association exists, "then the denial of probation would indeed be in accordance with *State v. Ivan.*" In effect he argues not that the judge abused his discretion but rather that he did not exercise any discretion at all. Finally he says that he is the victim of a mandatory policy in Essex County under which anyone convicted of a gambling offense receives a custodial sentence, whereas those convicted of other crimes receive greater consideration for probation.

I

*State v. Ivan, supra,* cannot be read as standing for the proposition that a mandatory prison sentence follows from a gambling conviction and that the judge is thereby robbed of his discretion in the matter of sentencing. If there were any doubt on that score, it should have been dispelled in *State v. DeStasio, supra,* where this Court observed:

"We have not dictated a course for the sentencing judge, and we could not in the absence of a right in the State to appellate review of sentences. Nonetheless we had occasion to express our views on this subject in *State v. Ivan,* 33 *N. J.* 197 (1960), and, as in other areas of judicial discretion, we would hope the sentencing judge would see the judiciary's responsibility as we see it. Presumably because we stated our views in *Ivan,* counsel assumed our administrative directive contained an order compelling adherence to them. There being no such order, and the sentencing judge being under no misapprehension, we need say no more to decide this case." [49 *N. J.* at 256].

Defendant in *Ivan,* pointing to his unblemished record, his regular employment, and his fidelity to family, protested as does Souss that the sentencing judge had a "preconceived policy that offenses of that kind [he had pleaded *non vult* to an indictment for bookmaking] merit the sentence imposed [there, one to two years and $5,000 fine]

without regard to the circumstances of the individual offender." In rejecting that argument Chief Justice Weintraub pointed out that the judge sentenced upon the "total circumstances," and that if the gambling offense were isolated and involved the defendant alone, the "lower end of the scale of punishment" would represent an appropriate sentence. Significantly for this case he added this: "But if the statutory prescription means anything, it must mean that if the crime is part of a larger operation, it merits stern treatment."

 While isolated remarks of the sentencing judge here, taken out of context, lend some support to defendant's contention that a custodial sentence was looked upon as mandatory for the offense of bookmaking, we are satisfied from a reading of the sentencing transcript as a whole that the judge not only was aware of the discretionary nature of his function but that he exercised that discretion wisely. He handed down the minimum custodial term allowed by the statute, *N. J. S. A.* 2A:112–3. In doing so he referred to defendant's association with syndicated gambling and to the fact that he was "dealing with James Lepore."[2] And while

---

[2] While the name standing alone in the sentencing transcript carries no special meaning for us, it obviously was of considerable significance to the sentencing judge. The presentence report, covering many of those who were swept up in the same raid that netted Souss, says this about Lepore:

"Members of the Essex County Prosecutor's Office and Belleville Police Department executed a search warrant at 264 Branch Brook Drive, apartment A, Belleville, New Jersey. Arrested were James Lepore and Angelo Cottone. Confiscated from the premises were various forms of gambling paraphernalia. Confiscated from James Lapore [sic] were two pieces of paper, one contained lottery bets in the amount of $136.04 in horse bets and sports bets in the amount of $1,748.00. Also $54.00 in each was taken from Mr. Lapore [sic]. A key was also confiscated from Mr. Lapore [sic] which fit the front door of the apartment rented by Angelo Cottone."

At oral argument defendant's attorney conceded that Souss "was not operating this business on his own," that he was "working his

it may well be that defendant had little by way of status in the hierarchy of organized crime, and indeed may not have been in a position to give the law enforcement authorities any information of real value, see *State v. Ivan, supra,* 33 *N. J.* at 199, 203, the fact remains that the syndicated gambling system cannot long survive without the efforts of those in Souss's position. He gave it both the necessary nourishment and encouragement. To believe he was not associated with organized crime would require a measure of naivete not befitting either the sentencing judge or ourselves. What this Court said in *Ivan* bears repeating:

> "[*W*]*hen the offense serves the interests of a widespread conspiracy,* it would be a mistake to think of the defendant as an isolated figure. He is part and parcel of an enterprise. The gambling racket is an ancient foe of society. It bilks the weak. It wrecks homes and destroys men. It spawns embezzlement, larceny and crimes of violence. It corrupts officialdom. It is reputed to be allied with other illicit traffic. The 'easy' money it yields doubtless finds its way under cover into legitimate fields, there to continue its polluting course.
>
> Such is the scene a judge should see in dealing with an offense of this kind. He would be myopic if he saw no more than the defendant before him. As the trial court aptly observed, a fine would be a license fee for the operators — a minor experience in a lucrative venture. A racket cannot be curtailed if fronts and tools are easily available, and they will be unless the price is too high." [33 *N. J.* at 202–203; emphasis added].

place of employment" and "calling in bets for himself and for others — a couple of other people" to Lepore, who also pleaded guilty to bookmaking.

Also at oral argument we were informed by the assistant prosecutor that the wiretap investigation as to Lepore had been conducted over a period of three weeks; that Souss had "called in" every day; that six or seven people bet with Souss who in turn telephoned the bets to Lepore.

Finally, it is suggested that the sentencing judge had special opportunity to be familiar wth Lepore's activities as a lower-echelon operator in a syndicated gambling scheme, inasmuch as he had executed orders for electronic surveillance in his capacity as Assignment Judge of Essex County.

II

Defendant's argument that gambling offenders in Essex County automatically receive custodial sentences, a circumstance which, if true, belies the exercise of any discretion, does not comport with the facts as they have been presented to us. The State's brief, drawing on statistics from an accompanying appendix, makes the point that during 1973, 299 persons were sentenced for violations of the gambling laws, and of those 299 defendants 76 were sentenced to New Jersey State Prison (one additional defendant was sentenced to the Clinton Correction Institution for Women). 159 defendants were sentenced to the Essex County Correction Center, 59 defendants were placed on probation, one defendant received a suspended sentence and one defendant was fined.

True, as defendant observes, these figures do not reveal how many of the 299 defendants were first offenders, nor do they disclose how the incidence of probation was affected by recommendations by the prosecutor's office, nor do they refer to the number of defendants who were, at the time of sentencing, charged with being members of organized crime. But if an argument favorable to defendant is to be constructed on the basis of any of these factors, we should be provided with a more complete record than has been furnished us. The same is true with respect to the argument that greater consideration for probation is given to offenders convicted of other than gambling offenses — the data are inadequate. Additionally, we note that this phase of defendant's contentions was in no wise alluded to, much less squarely presented, in the courts below and thus need be given no consideration here, see *Nieder v. Royal Indemnity Ins. Co.*, 62 *N. J.* 229, 234 (1973). In any event, to the extent that the figures presented have meaning, they do not give comfort to defendant, as demonstrated above.

However, there may be sound policy reasons, not briefed or argued at all below and barely touched on before us, in

support of the wider use of probation techniques for "situational" crimes. Turning again to *Ivan*:

"If the offense has strong emotional roots or is an isolated event unassociated with a pressing public problem, there is room for greater emphasis upon the circumstances of the individual offender. On the other hand, if the crime is a calculated one and part of a widespread criminal skein, the needs of society may dictate that the punishment more nearly fit the offense than the offender. There the sentencing judge may conclude he should give priority to punishment as a deterrence to others and as an aid to law enforcement. The doubts that may beset the deterrent effect of punishment when the crime is steeped in emotional pressures recede sharply when the motivation is pecuniary and the criminal event is part of a calculated 'business' venture. If the prevailing thinking does not strongly support this view, at least no one can demonstrate that those who act upon it do so without legal warrant." [33 *N. J.* at 202].

### III

We retreat not one bit from this Court's position in *Ivan*. That decision does not compel a prison term for every bookmaking offense; it does allow for the judicious resort to discretion in sentencing; and in the exercise thereof a defendant's connection with organized crime is a most important factor to consider, along with all the other circumstances, in determining the severity of punishment to be meted out. See *State v. Leverette,* 64 *N. J.* 569, 571 (1974). Those standards having been adhered to and there being no abuse of discretion revealed in this record, the judgment below is:

Affirmed.

*For affirmance*—Chief Justice HUGHES, and Justices JACOBS, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—6.

*For reversal*—None.