736 A.2d 532 (1999)
324 N.J. Super. 525
STATE of New Jersey, Plaintiff-Respondent,
v.
Corey MALLOY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted August 3, 1999.
Decided September 21, 1999.
*533 Ivelisse Torres, Public Defender, for defendant-appellant (Alison Perrone, Assistant Deputy Public Defender, of counsel and on the brief).
Arthur J. Marchand, Cumberland County Prosecutor, for plaintiff-respondent (Kevin M. Guinan, Assistant Prosecutor, of counsel and on the brief).
Before Judges KESTIN and FALL.
The opinion of the court was delivered by KESTIN, J.A.D.
Following involuntary waiver of juvenile jurisdiction, R. 5:22-2, defendant was indicted on four counts of first degree robbery, four counts of second degree aggravated assault, possession of a handgun for unlawful purpose (second degree), unlawful possession of a handgun (third degree), and four counts of fourth degree aggravated assault. Prior to trial, the four second degree aggravated assault charges were dismissed on the State's motion. The jury convicted defendant on the remaining counts of the indictment.
After mergers were effected, defendant was sentenced on each of the armed robberies to concurrent ten year terms of imprisonment with three-and-one-third years of parole ineligibility, along with a concurrent term of four years on the third degree weapon offense. Appropriate statutory fees and assessments were also ordered.
On appeal, defendant raises the following issues:
POINT I DEFENSE COUNSEL'S FAILURE TO REQUEST A WADE HEARING TO CHALLENGE THE
*534 STATE'S IDENTIFICATION EVIDENCE DENIED DEFENDANT THE EFFECTIVE ASSISTANCE OF COUNSEL. (Not Raised Below)
POINT II DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE TRIAL COURT'S ABBREVIATED IDENTIFICATION INSTRUCTION DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL. (Not Raised Below)
POINT III THE POTENTIAL FOR PREJUDICE FROM THE TRIAL COURT'S ABBREVIATED IDENTIFICATION INSTRUCTION WAS INCREASED BY THE JUDGE'S CLOSING REMARKS TO THE JURY WHICH TRIVIALIZED THE DUTY OF THE JURY TO CAREFULLY APPLY THE LAW TO DEFENDANT'S CASE AND MINIMIZED THE STATE'S BURDEN OF PROOF. (Not Raised Below)
We reverse the convictions and remand for a new trial.
Identification was the focal issue of this trial. Four young men, Sebastian Wecer, Edward Cliff, Michael Weber and Mark Campana had been robbed at gunpoint at about 12:45 a.m. on January 26, 1997. Wecer, Cliff and Weber testified at the trial.
According to Wecer, they were in a car parked in front of Cliff's home in Vineland, about to drive to a nearby diner. Campana was in the driver's seat; Cliff was in the front passenger seat; Wecer was in the back seat behind Campana; Weber was behind Cliff. A young black male, wearing dark pants, a black vest and a black ski cap on his head, knocked on a passenger-side window, and asked for directions. He then put a semiautomatic pistol to the window and said: "Well, let me get $5 from this company." Before the occupants of the car could lock all the doors, the assailant opened the driver's door, illuminating the interior of the car. The robber pointed the handgun at each of the four victims and pulled its trigger two or more times. It did not fire. A dollar and a wallet were taken from the victims, along with a cassette tape which the assailant took from the car's tape player.
In his testimony, Wecer identified defendant as the assailant. Wecer could not identify a toy revolver that had been stipulated into evidence. The toy revolver had been found by the police on the grounds of the Children's Residential Facility (CRF) at the State Developmental Center (Center) at 2 p.m. on the same day as the robbery. The Center was near the location of the robbery. Wecer insisted that he had a knowledge of firearms, and that the robbery had been conducted with a real semiautomatic handgun. Before his direct testimony concluded, Wecer identified a black knit ski cap and a black vest as articles worn by defendant during the incident.
Following the robbery, the victims went to the diner. After spending some time there, they proceeded to Wecer's home to tell his parents what had occurred. The incident was then reported to the police, and officers were dispatched to the Wecer home, arriving at about 2:30 a.m.
All four victims went to police headquarters where their statements were taken. A police officer suggested a "drive-by" identification. Wecer got into a police car because he "was the only one who could remember or identify the ... suspect." He was in the rear seat of the police car, behind the driver, and was taken to a soccer field at the CRF. During cross-examination, Wecer described the "drive-by" identification as follows:
A. [W]e were stationed at the soccer field. And the lights were all off in the ... police car I was in. And then another police car came by with the two suspects in the back. And you would drive ... very slowly with the lights flashed on them. * * *
*535 Q. "Lights flashed on them." What lights?
A. They had like a spotlight in the car.
* * * *
Q. Two separate spotlights, one for each of them, or just one light?
A. Just one in the back. Like it was just a spotlight in the back.
Q. Okay; and where was the light coming from?
A. The police officer had it.
Q. Where was the police officer, sitting in front?
A. Yeah.
Q. So the officer in the car was shining the light on each of them?
A. Uh-huh.
Q. Back and forth?
A. Yeah.
Q. Okay. And you need[ed] the light to see their faces, obviously; right?
A. Yes.
Q. So they're driving by with this flashlight going back and forth. Do you recall who was seated ... behind the driverwho was seated behind the passenger[?]
A. I don't recall.
Q. Okay. So they're driving by slowly. Go ahead.
A. And we did it a couple times ... just to make sure. Like, to see if I was making a positive identification.
Q. The first time that ... they drove by you were unsure?
... [T]he first time we drove by, ... I just wanted to make sure. I mean, I recognized him, but I just wanted to make sure before I accused anyone.... So I just made sure who did it.... [A]fter the second time I made a positive identification.
Q. But you don't recall where he was seated?
A. I don't ... recall. That was so long ago.
Q. You're behind the driver and the car drives by coming towards the way your car was or going in the same direction your car was
A. ... [W]e were ... going in this direction and the other car was going in this direction.
Q. So in the opposite direction
A. Yeah.
Q. from where you were facing?
A. Uh-huh.
Q. And you don't recall whether Corey or Brockwhat seats they were in?
A. No.
Q. And it's fair to say that the only time you can see the face of whoever was in the backseat was at the moment where that officer had a flashlight on that particular individual's face?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. So you make the identification and they bring you back to the police station and you go home?
A. Yeah.
Q. Do you remember the events clearly today?
A. Yeah, ... I can remember mostly all the events that happened, like everything ... pretty much in detail.
Q. Okay. And it's been since January 26th, `97, a little over a year, * * * 14 months since this happened?
A. Yeah.
Q. Okay.... [D]o you think you've lost some of the details over time?
A. Yeah, but, I mean, certain questions will bring back ... certain details.
*536 Further cross-examination followed in which it was revealed that Wecer had omitted to relate some details of the assailant's attire in giving a description to the police; and that, at the time of the drive-by identification, defendant was not wearing the vest ascribed to the assailant, and may not have been wearing the cap.
Another victim, Edward Cliff, in his testimony, generally corroborated Wecer's depiction of the robbery incident. He stated, however, that he could not positively identify the assailant; but the black ski cap and black vest that had been marked for identification looked familiar to him as clothing the assailant had worn. On cross-examination Cliff answered "no" to the question: "And sitting there today you could look over at Corey Malloy and you wouldn't know whether or not he was the person that committed this crime or not... ?"
Michael Weber, a third victim, testified as well, also corroborating Wecer's testimony. He, too, could not identify the robber, although he recognized the vest and cap as resembling those worn by the assailant. He testified on cross-examination that the assailant pulled the trigger on the gun several times, and that, twice when the trigger was pulled, the weapon was pointed at his, Weber's, face.
In identifying the black cap, none of the victim/witnesses remembered a white patch that was on it. Each victim/witness also testified that the assailant was accompanied by another young black male who did not actively participate in the robbery, but who left the scene with the assailant.
Vineland police patrolman Felix Martinez testified that at 1:49 a.m. he had been dispatched to the State Developmental Center on a report of trespassers. As he arrived, he saw two black males walking north away from the Center. He stopped these persons, identified them as defendant and Brock Sheard, and determined that both were staying at the CRF. A pat-down search revealed nothing, and the young men were taken back to the CRF.
Some time thereafter, Martinez received instructions to proceed to the Wecer residence. He spoke with the victims of the robbery at about 2:30 a.m. He noted that Wecer's description of the assailant matched defendant, who had been wearing a black vest when encountered by Martinez about an hour earlier. Martinez decided to conduct the "drive-by" identification. He drove to the CRF to retrieve defendant and Sheard; and he returned with them to the designated site. Defendant and Sheard rode in the back seat of Martinez's car during the drive-by identification. Defendant was wearing a black ski jacket at the time. After the drive-by identification, another police officer recovered the black vest from defendant's room at the CRF.
Martinez also testified that "only one drive-by was used," in contradistinction to Wecer who had testified that two "drive-bys" had occurred when he hesitated to make the identification. Patrolman Thomas Wrigley also testified. He was the driver of the police vehicle in which Wecer was riding during the "drive-by" identification. Wrigley testified that the distance between the vehicles was about twelve feet, and that Wecer identified defendant "without hesitation."
Brock Sheard also testified for the State. He stated that he was defendant's companion on the night of the incident. At about 12:30 a.m. they, together, ran away from the CRF and went to a Wawa convenience store. They became separated for about thirty minutes. When Sheard was walking back and had entered Center property, he encountered defendant who told him "that he robbed somebody [in a car] for a tape and a dollar and a wallet." Sheard also testified that defendant told him he had used a toy gun in the robbery; and that defendant displayed the gun to him and then threw it in the bushes. Sheard identified the toy gun in evidence as the item. He also acknowledged that he had been charged with the robbery *537 along with defendant, but that the charges against him were dismissed in exchange for his testimony against defendant. He denied being involved in the robbery or having been in the vicinity of the victims' automobile.
No witnesses were presented for the defense. A stipulation was placed on the record:
The Vineland Police dusted the GEO Metro for fingerprints and found 19 fingerprints. Only three of these fingerprints were suitable for comparison purposes. These three fingerprints were not Corey Malloy's fingerprints.
The defense summation, among other arguments, emphasized inconsistencies and discrepancies of detail in the testimony of the three victim/witnesses and the police officers, as well as in the testimony of Wecer and the two police officers involved concerning procedures used in the "drive-by" identification. Counsel concentrated on this confusion and argued that the circumstancesincluding the inability of all but one of the four victims to identify defendantsuggested that Wecer's identification of defendant as the assailant both at the scene and at trial could not be relied upon to reach a conclusion beyond a reasonable doubt that defendant was the robber. The State, in its summation, endeavored to place all inconsistencies in more positive perspective, and emphasized those elements of proof that tended to establish the validity of Wecer's identification of defendant.
The whole of the trial judge's charge to the jury on the issue of identification was:
Now, the defendant as part of his general denial of guilt contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that he is the person who committed the offense. Where the identity of the person who committed the offense is an issue, the burden of proving that identity is upon the State.
The State must prove beyond a reasonable doubt that this defendant is the person who committed the crime. The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proved beyond a reasonable doubt that this defendant is the person who committed the crime or crimes.
Given the criticality of the identification issue, the nature of the proofs addressing that issue, and the circumstances of the crime committed, we regard this instruction to have provided inadequate guidance to the jury on how validly to discharge its fact-finding function on the identification question.
We begin with the realization that defendant's failure to register an objection to the charge deprived the trial judge of an opportunity to reflect on the now-advanced error and correct it during the trial. In most such instances, a defendant is held to be limited in the argument available on appeal, see, e.g., State v. Bogus, 223 N.J.Super. 409, 419, 538 A.2d 1278 (App.Div.), certif. denied, 111 N.J. 567, 546 A.2d 497 (1988); see also State v. Souss, 65 N.J. 453, 460, 323 A.2d 484 (1974); at most, the plain error standard is seen to apply, see Bogus, supra, 223 N.J.Super. at 420, 538 A.2d 1278. On the other hand, because charging errors are usually regarded as poor candidates for rehabilitation by harmless error treatment, State v. Vick, 117 N.J. 288, 289, 566 A.2d 531 (1989), the qualitative assessment that plain error analysis entails must be different when a charging error is asserted than when a less critical type of error is assigned. See State v. Jordan, 147 N.J. 409, 422-23, 688 A.2d 97 (1997). No surer showing of a clear capacity to bring about *538 an unjust result can be made than a basic error in instructing the jury. See ibid.
If a charge on identification was necessary, which it manifestly was, the abbreviated instruction which the trial judge gave was fundamentally inadequate under any circumstances. See State v. Walker, 322 N.J.Super. 535, 545-50, 731 A.2d 545 (App.Div.1999); State v. Middleton, 299 N.J.Super. 22, 32-33, 36-37, 690 A.2d 623 (App.Div.1997); State v. Frey, 194 N.J.Super. 326, 329-30, 476 A.2d 884 (App.Div.1984). It was incomplete as a general matter, and it fell far short of meeting the specific needs of this case. Only the addition of the remainder of the model charge, which the trial judge omitted, interlaced with the focused review of the evidence bearing upon the issue required by law, would have provided this jury with the necessary guidance. See Walker, supra, 322 N.J.Super. at 551, 731 A.2d 545 (noting the "difference between a court `explaining the law in the context of the facts of the case,'" which is required, and "a court commenting upon the credibility of the evidence[,]" which is not required, but is left to the trial judge's discretion). The omitted general provisions are:
In order to meet its burden with respect to the identification of the culprit the State has presented the testimony of the witness____________________.You will recall that this witness identified the defendant in court as the person who committed the offense. According to the witness, (his/her) identification of the defendant in court is based upon the observations and perceptions which (he/she) made of the defendant on the scene at the time the offense was being committed. It is your function as jurors to determine what weight, if any, to give to this testimony. You must decide whether it is sufficiently reliable evidence upon which to conclude that this defendant is the person who committed the offense charged.
In going about your task you should consider the testimony of the witness in the light of the customary criteria concerning credibility as I have explained them to you. It is particularly appropriate that you consider the capacity or the ability of the witness to make observations or perceptions as you gauge it to be and that you consider the opportunity which the witness had at the time and under all of the attendant circumstances for seeing that which (he/she) says (he/she) saw or that which (he/she) says (he/she) perceived with regard to (his/her) identification of the person who committed the alleged offense.
(Here consider briefly reviewing the conflicting contentions of the State and the defendants relating to the above)
Unless the in-court identification results from the observations or perceptions of the defendant by the witness during the commission of the crime rather than being the product of an impression gained at the out-of-court identification procedure it should be afforded no weight. Thus the ultimate issue of the trustworthiness of an in-court identification is for you to decide.
If, after a consideration of all of the evidence, you have a reasonable doubt as to the identity of the defendant as the person present at the time and place of the crime you must acquit (him/her). If, however, after a consideration of all of the evidence you are convinced beyond a reasonable doubt of the defendant's presence at the scene you will then consider whether the State has proved each and every element of the offense charged beyond a reasonable doubt.
[Model Jury Charges (Criminal), "Identification" (1990).]
We repeat for emphasis, however, that even if this latter portion of the model charge had been given, its addition alone, without a discussion of the evidence and the law in the context of the material elements of fact in the case, would have *539 been deficient as well. See State v. Edmonds, 293 N.J.Super. 113, 118, 679 A.2d 725 (App.Div.1996) (quoting State v. Concepcion, 111 N.J. 373, 379, 545 A.2d 119 (1988)), certif. denied, 148 N.J. 459, 690 A.2d 606 (1997). In this connection, we are mindful of an admonitory note which the Supreme Court's Committee appended to its model charge on identification:
Whether or not a separate charge on the subject of identification is necessary depends upon the situation presented in an individual case. The Committee recognizes that in a simple case the issue may be submitted to the jury wholly within the framework of a charge on credibility generally. However, where the issues presented are multi-faceted and somewhat complex consideration should be given to an in-depth charge. The Committee is of the view that a model charge fit for universal application is impossible of formulation. The following suggested charge is intended as a tool and should not be delivered without some forethought.
[Model Jury Charges (Criminal), "Identification" (1990).]
If a Wade [*] hearing had been held, the trial court would have been required to decide, as a matter of law, whether the identification procedures used, i.e., the features of the "drive-by" identification, were so unreliable or suggestive as to taint Wecer's in-court identification. See State v. Madison, 109 N.J. 223, 232-33, 536 A.2d 254 (1988). If the court deemed the identification testimony to be admissible, other facets of the reliability/suggestiveness conceptthose implicating findings of fact and determinations of credibilitywould be reserved for the jury's determination. See State v. Grant, 254 N.J.Super. 571, 590 n. 4, 604 A.2d 147 (App.Div.1992). Cf. State v. Michaels, 136 N.J. 299, 321-22, 642 A.2d 1372 (1994). In such circumstances, the trial court might have been impelled more naturally to provide the jury, as part of a fuller instruction, with a sufficiently particularized analysis of the record pertaining to the issues the jury was called upon to decide. Nevertheless, the absence of a request for a Wade hearing furnishes no excuse for deficient guidance from the trial court. Defendant, in his brief on appeal, has aptly characterized some of the qualities of the identification issue in this case:
There were several factors which cast doubt on Wecer's identification of the assailant and underscored the necessity for a proper identification charge. For example, ... Wecer's identification was unreliable because it resulted from an unduly suggestive identification procedure. Furthermore, Wecer's ability to perceive the assailant at the time of the robbery was questionable because, as Wecer admitted, the robbery was over very quickly and left him "too shocked to speak." Also, the robbery occurred in the middle of the night and Wecer's back seat view had to have been at least partially obstructed by the person sitting in front of him.
Wecer's ability to perceive was further cast into doubt by his failure to accurately recount the drive-by. Not only did Wecer's account of how the drive-by was conducted conflict with the police officers' accounts, but Wecer also said there were two drive-bys when the Officers Martinez and Wrigley both said that there was only one. Most critically, Wecer could not remember whether he had implicated the person who had been sitting in the rear driver's side seat or the person who had been sitting in the rear passenger's side seat of the patrol car. (citation omitted).
No argument offered by the State detracts from the accuracy of these characterizations or the power of the point made. Nor does the State address the impact on this case of the characteristic deficiencies which show-up-type identifications are regarded to have, see, e.g., Webb v. Havener, *540 549 F.2d 1081 (6th Cir.), cert. denied, 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 153 (1977) (cited in State v. Clausell, 121 N.J. 298, 328-29, 580 A.2d 221 (1990)), or the special potential for suggestiveness which the use of a "flashlight" or "spotlight" may have had during the "drive-by" identification. There is no question that this was precisely the type of case which required fuller instructions on identification than were given.
Defense counsel's failure to object to the all-too-thin charge on identification cannot be used talismanically as a basis for disregarding, the trial court's error in omitting to give the jury proper guidance, through a complete instruction, on how to evaluate the identification evidence. In the circumstances of this case, the error is plain. Compare, e.g., State v. Green, 86 N.J. 281, 293-94, 430 A.2d 914 (1981); Frey, supra, 194 N.J.Super. at 329-30, 476 A.2d 884.
With a decision on this basis and the resulting reversal, we need not address the other issues raised by defendant. We are constrained to comment, however, that we can discern no valid reason, given the quality of the identification evidence, why defendant's trial counsel would omit to request a Wade hearing.
Further, defendant ascribes a trivialization of the jury's function to a comment the judge made near the close of his charge:
Now, the instructions I have given you, many parts of which I have read and I read them because the Appellate courts demand that those instructions be given to you with some specificity. And I don't want to wing it and miss something. And I know that listening to it is sometimes not so easy to grasp. And they involve in some instances concepts that lawyers spend weeks, if not months, learning in law school.
But I think that you get the general gist or thrust of it. At least that's been the experience of the courts, that the juries readily pick up those meanings and come to an understanding as to what those instructions mean.
Although we do not regard this comment, in context, to have been error, it would have been better left unsaid.
Reversed and remanded for a new trial.
NOTES
[*] United States v. Wade. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.Id 1149 (1967).