750 A.2d 139 (2000)
330 N.J. Super. 479
STATE of New Jersey, Plaintiff-Respondent,
v.
Carl B. PIERCE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued April 3, 2000.
Decided May 4, 2000.
*141 Wayne Powell, Cherry Hill, for defendant-appellant (Roderick Taylor Baltimore, on the brief).
Steven A. Yomtov, Deputy Attorney General, for plaintiff-respondent (John J. Farmer, Jr., Attorney General, attorney for plaintiff-respondent; Mr. Yomtov, of counsel and on the brief).
Before Judges HAVEY, KEEFE and COLLESTER.
*140 The opinion of the court was delivered by COLLESTER, J.A.D.
In this appeal we are constrained to reverse the defendant's conviction and remand for a new trial because of the inadequacy of the jury instruction as to identification and the improper and prejudicial comments in the prosecutor's summation regarding the post-arrest silence of the defendant.
Tried to a jury on Cumberland County Indictment No. 97-06-00582, defendant Carl B. Pierce was convicted of murder, contrary to N.J.S.A. 2C:11-3a(1)(count one); possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (count two); unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5b (count three); and first degree robbery, contrary to N.J.S.A. 2C:15-1 (count four). The sentencing judge imposed an aggregate term of life imprisonment with a thirty-year period of parole disqualification.
The incident giving rise to the defendant's conviction was an attempted robbery and murder of James Spencer on Southeast Avenue in Vineland at about 11:30 p.m. on Valentine's Day, February 14, 1997. The State's proofs were that on February 14, 1997, at about 10:00 p.m. Iesha Barriento picked up her boyfriend, James Spencer, in her mother's car to celebrate Valentine's Day. After dinner at about 11:30 p.m., they drove to an apartment in Millville to visit Spencer's brother, his cousin and Rasholi Woodard. After a few minutes, Spencer, Barriento and Woodard left the apartment.
Spencer drove along Southeast Avenue with Barriento in the passenger seat and Woodard in the rear. Spencer decided to make a phone call to his brother so he pulled over about eight feet from a phone booth near the Florence Park apartments. When Spencer walked to the phone booth, Barriento and Woodard saw a car park on the opposite side of the street and a man dressed in a black hooded sweatshirt or jacket walk to the phone booth next to the one used by Spencer.
After Spencer finished his call, he walked toward the car when the other man spoke to him. Spencer continued walking and knocked on the passenger-side window. Barriento rolled down the window, and Spencer asked her the time. She told him it was about midnight. As Barriento rolled up her window, she heard the other man demand money from Spencer and Spencer respond that he had no money. The two men began to struggle next to the passenger side door. There was a gunshot. Both Barriento and Woodard saw the man point a handgun at Spencer's chest. After a second shot, Woodard saw feathers fly from the chest of Spencer's jacket. The two witnesses heard three or four gunshots in all.
Patrolman Nicholas Yuhas of the Vineland Police Department received a radio call of a shooting, arriving at the scene about a minute later. Yuhas tried to speak with Spencer who was lying on the pavement but did not get any response. Spencer was later pronounced dead as a result of two bullet wounds in his chest.
Woodard described the assailant as a Puerto Rican male, approximately six feet, one to two inches in height, 200 pounds *142 and wearing a large hooded black coat. He said the man drove a bluish-green two-door hatchback, possibly a Hyundai. The police were never able to locate the vehicle fitting Woodard's description. A search of the crime scene revealed four bullet casings, but the handgun was never found.
At the scene Barriento was unable to provide a description of the shooter. After she was taken to the Vineland police station, she gave a statement to Detective Louis Negron in which she described the man as light-skinned, heavyset and having a "chunky" face. She did not notice any facial hair, but did observe that the man wore glasses.
Detective John Brunetta interviewed Barriento in order to complete a composite sketch. She said that the assailant was six to ten feet from her, describing him as heavyset with a round face. She did not mention facial hair. Detective Brunetta completed a composite sketch that Barriento confirmed was a fair resemblance of the assailant.
Later that morning Sergeant Richard Calareso prepared and showed Barriento an array of six photographs including one of defendant taken on February 17, 1994, showing him with facial hair. Barriento did not select any of the six photographs. She testified at the trial that she believed one of the photographs resembled the assailant but did not make an identification at that time because the facial and head hair made her uncertain.
Barriento was also shown photographs within files maintained by Vineland police that were organized into sections for Hispanic and black males. She looked through about half of the Hispanic group before requesting to be excused at 4:30 a.m. because she was exhausted. On February 19, 1997, Barriento returned to the police station and completed reviewing all of the photographs in the Hispanic and black sections of the Vineland police files. Three photographs of defendant were contained in the files, but Barriento made no identification. She later testified at trial that one of the photographs she viewed resembled the assailant.
The following day, February 20, 1997, Barriento reviewed another photographic array, which included a picture of defendant that was taken four days earlier. All of the photographs in this array had facial hair and were light skinned. This time Barriento chose defendant's photograph as depicting the person who shot Spencer. She told Detective Negron that she had seen defendant's face in the first array and in the file photographs, but did not say anything because she was unsure and still upset about the incident.
At trial Barriento testified that on the night of the shooting she looked at the assailant for a couple of seconds and noticed that he wore glasses and that his face was chunky and light-skinned. She could not see any facial hair since a hood covered his head. She described the man as taller than Spencer, who was six feet, two inches tall, and heavyset, weighing about 200 pounds. She made an in-court identification of the defendant.
Woodard testified that he knew the defendant and could not identify him as the shooter because he never saw the assailant's face. He said that the killer was light-skinned, possibly a Hispanic male, taller than Spencer and weighed about 200 pounds. Woodard did not observe any facial hair.
Defendant is a six foot, one inch tall Afro-American. At the time of his arrest, he weighed 286 pounds and had a beard.
The defense was alibi. Defendant's friend, Thomas Moore, testified that on February 14, 1997, at 9 p.m., defendant asked to meet him later that evening at the apartment of his sister, Yvonne Pierce. According to Moore, he arrived at the apartment at approximately 11:00 p.m., and defendant arrived a few minutes later. Moore said that when he left the apartment an hour later, defendant was still present.
*143 Yvonne Pierce testified that defendant came to her apartment between 5:00 and 5:30 p.m. that evening. He left a few minutes before Moore arrived at 11:00 p.m. to get something from their mother's house and returned within ten to fifteen minutes. After Moore left at about midnight, defendant stayed at the apartment overnight. Yvonne testified that between 2:00 and 3:00 a.m. she received a phone call from a Vineland police officer who told her that the police were looking for her brother. Although defendant was asleep on her couch, she told the officer that she did not know his whereabouts. She awoke defendant after the call and told him that the police were looking for him. When the police came to the apartment the next morning, Yvonne said again she did not know her brother's location.
Defendant testified that he arrived at his sister's apartment at approximately 6:30 p.m. He said he left the apartment at 10:45 p.m. to go to his mother's house and returned in fifteen to twenty minutes. He confirmed that his sister awakened him to tell him that the police called asking about him.
The State presented rebuttal testimony by Detective Negron who said that defendant called him on March 10, 1997, and asked to speak with him. Detective Negron met with defendant who told him that on February 14th he arrived at his sister's house at about 6:00 or 7:00 p.m. and stayed there the entire night. He did not say that he left to go to his mother's house.
Defendant sets forth the following arguments on appeal:
I. THE TRIAL COURT'S FAILURE TO CHARGE THE LESSER INCLUDED OFFENSE OF AGGRAVATED MANSLAUGHTER CONSTITUTED REVERSIBLE ERROR AND TRIAL COUNSEL'S ACQUIESCENCE IN THIS REGARD DEPRIVED MR. PIERCE OF EFFECTIVE ASSISTANCE OF COUNSEL. (Not Raised Below.)
II. THE TRIAL COURT'S CHARGE TO THE JURY ON IDENTIFICATION WAS INADEQUATE AND INCOMPLETE AND RESULTED IN MR. PIERCE BEING DEPRIVED OF HIS RIGHT TO A FAIR TRIAL UNDER BOTH THE NEW JERSEY AND FEDERAL CONSTITUTION. (Not Raised Below.)
III. THE TRIAL COURT ERRED IN ADMITTING THE PRETRIAL AND IN COURT IDENTIFICATION TESTIMONY OF IESHA BARRIENTO REGARDING CARL PIERCE. (Not Raised Below.)
IV. THE TRIAL COURT PREVENTED MR. PIERCE FROM PRESENTING A DEFENSE, THEREBY DEPRIVING HIM OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL. (Not Raised Below.)
A. THE TRIAL COURT IMPROPERLY LIMITED THE DEFENSE IN ITS CROSS-EXAMINATION OF DETECTIVE LOUIS NEGRON.
B. THE TRIAL COURT'S FAILURE TO PERMIT THE INTRODUCTION OF EXCULPATORY EVIDENCE BY THE DEFENSE DEPRIVED MR. PIERCE OF HIS RIGHT TO A FAIR TRIAL.
V. THE FAILURE OF THE TRIAL COURT TO CHARGE THE JURY ON PRIOR CONTRADICTORY STATEMENTS OF WITNESSES DEPRIVED MR. PIERCE HIS RIGHT TO A FAIR TRIAL UNDER BOTH THE NEW JERSEY AND FEDERAL CONSTITUTION AND TRIAL COUNSEL'S FAILURE TO REQUEST SUCH A CHARGE OR INSTRUCTION DEPRIVED MR. PIERCE OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. (Not Raised Below.)
VI. THE FAILURE OF TRIAL COUNSEL TO CALL PABLO VALENTIN, HECTOR ARTESE, EMILIANO VASQUEZ, OR INVESTIGATOR GREEN AS WITNESSES CONSTITUTE *144 INEFFECTIVE ASSISTANCE OF COUNSEL AND DEPRIVED MR. PIERCE OF HIS RIGHT TO A FAIR TRIAL AND THE FAILURE OF THE STATE TO PRODUCE EMILIANO VASQUEZ AT MR. PIERCE'S TRIAL INFRINGED ON MR. PEIRCE'S RIGHT TO A FAIR TRIAL. (Not Raised Below.)
VII. THE JURY PANEL SHOULD HAVE BEEN EXCUSED BECAUSE OF THE PREJUDICIAL COMMENT OF PROSPECTIVE JUROR ANDREW BONNER AND THE JURY TO DECIDE CARL PIERCE'S GUILT OR INNOCENCE SHOULD HAVE BEEN SELECTED FROM A NEW PANEL.
VIII. THE FAILURE OF TRIAL COUNSEL TO CROSS EXAMINE STATE'S WITNESS DELILIAH SPENCER-TAYLOR DEPRIVED MR. PIERCE OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. (Not Raised Below.)
IX. THE IMPROPER METHODS UTILIZED BY THE PROSECUTOR DURING THE EVIDENTIARY PORTION OF THE TRIAL AND DURING SUMMATION JOINTLY OPERATED TO DENY MR. PIERCE A FAIR TRIAL. (Partially Raised Below.)
X. THE TRIAL COURT IMPOSED AN UNDULY HARSH AND MANIFESTLY EXCESSIVE SENTENCE.
XI. THE VERDICT WAS AGAINST THE WEIGHT OF THE CREDIBLE EVIDENCE AND VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.
We conclude that the trial judge's instruction to the jury on identification was inadequate and constituted plain error (point II) and that the prosecutor made impermissible comments in summation regarding defendant's post-arrest silence (point IX).
Identification was the key issue to be determined by the jury, and it also went to the heart of the alibi defense. Barriento's in-court and out-of-court identifications of defendant were based on a brief late night street encounter. There were inconsistencies between her initial description and the defendant's actual appearance. She was unable to make an identification of defendant as the assailant until the fifth time she viewed a photograph of him.
Since there was no specific request to charge on the issue of identification and no objection to the instruction to the jury on that issue, defendant's arguments must be subject to the plain error rule. R. 2:10-2; R. 1:8-7(a); State v. Timmendequas, 161 N.J. 515, 576, 737 A.2d 55 (1999); State v. Bogus, 223 N.J.Super. 409, 419, 538 A.2d 1278 (App.Div.), certif. denied, 111 N.J. 567, 546 A.2d 497 (1988). Defendant must establish not only that there was error but that it was clearly capable of producing an unjust result. State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971). In the instance of a charging error, the qualitative assessment under the plain error rule is different than where other forms of judicial error are assigned since the clear capacity to produce an unjust result is more likely in the case of an erroneous or insufficient instruction to the jury. State v. Vick, 117 N.J. 288, 289, 566 A.2d 531 (1989)(charging errors are usually considered "poor candidates" for an appellate finding of harmless error); see also State v. Martin, 119 N.J. 2, 15, 573 A.2d 1359 (1990); State v. Warren, 104 N.J. 571, 579, 518 A.2d 218 (1986).
In a case in which eyewitness identification is a significant issue, a jury is not properly instructed as to the evaluation of such testimony by a general charge on credibility. State v. Green, 86 N.J. 281, 290, 430 A.2d 914 (1981). A special charge is necessary because "[t]he vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification." United States v. Wade, 388 U.S. 218, 228, *145 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149, 1158 (1967).
In Green the Supreme Court held that under circumstances where identification is the key issue, a trial judge's failure to give a specific instruction to assist the jury's evaluation of eyewitness identification constituted reversible error. State v. Green, supra, 86 N.J. at 293, 430 A.2d 914. An appropriate charge in such a case would state that the State's burden of proof on the issue of identification is beyond a reasonable doubt and set forth the respective factual contentions relating to witness descriptions and identifications. Ibid. The Model Jury Charge on identification was considered suitable as a guide. Ibid.; see also State v. Malloy, 324 N.J.Super. 525, 534-36, 736 A.2d 532 (App.Div.1999). The Model Charge in this instance is as follows:
In order to meet its burden with respect to the identification of the culprit the State has presented the testimony of the witness________. You will recall that this witness identified the defendant in court as the person who committed the offense. According to the witness, (his/her) identification of the defendant in court is based upon the observations and perceptions which (he/ she) made of the defendant on the scene at the time the offense was being committed. It is your function as jurors to determine what weight, if any, to give to this testimony. You must decide whether it is sufficiently reliable evidence upon which to conclude that this defendant is the person who committed the offense charged.
In going about your task you should consider the testimony of the witness in the light of the customary criteria concerning credibility as I have explained them to you. It is particularly appropriate that you consider the capacity or the ability of the witness to make observations or perceptions as you gauge it to be and that you consider the opportunity which the witness had at the time and under all of the attendant circumstances for seeing that which (he/she) says (he/ she) saw or that which (he/she) says (he/she) perceived with regard to (his/ her) identification of the person who committed the alleged offense. (Here consider briefly reviewing the conflicting contentions of the State and the defendants relating to the above.)
Unless the in-court identification results from the observations or perceptions of the defendant by the witness during the commission of the crime rather than being the product of an impression gained at the out-of-court identification procedure it should be afforded no weight. Thus the ultimate issue of the trustworthiness of an in-court identification is for you to decide.
If, after a consideration of all of the evidence, you have a reasonable doubt as to the identity of the defendant as the person present at the time and place of the crime you must acquit (him/her). If, however, after a consideration of all of the evidence you are convinced beyond a reasonable doubt of the defendant's presence at the scene you will then consider whether the State has proved each and every element of the offense charged beyond a reasonable doubt.
[Model Jury Charges (Criminal), "Identification" (1990)(emphasis added).]
The identification charge given by the trial judge in the instant case was the following:
Now, as you're certainly well aware of in this case, of prime consideration is the issue of identification. Defendant as part of his general denial of guilt contends that the State has not presented sufficient, reliable evidence to establish beyond a reasonable doubt that he is the person who committed the alleged offense. Where the identity of the person who committed the crime is an issue, the burden of proving that identity is upon the State. The State must prove beyond *146 a reasonable doubt that this defendant is the person who committed the crime. The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else, or to prove the identity of that person.
You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt that this is the defendantthat this defendant is the person who committed it.
This truncated version of the Model Charge is insufficient to focus the jury on the particular credibility issue of eyewitness identification central to the proper determination of this case. See State v. Green, supra, 86 N.J. at 292, 430 A.2d 914; State v. Malloy, supra, 324 N.J.Super. at 536-37, 736 A.2d 532; State v. Edmonds, 293 N.J.Super. 113, 118, 679 A.2d 725 (App.Div.1996), certif. denied, 148 N.J. 459, 690 A.2d 606 (1997). It is not always necessary to supplement the special charge approved by State v. Green, supra, or the Model Charge with particularized comments on inconsistencies or contradictions within the State's identification testimony, particularly when the issue is raised as plain error. State v. Swint, 328 N.J.Super. 236, 259-60, 745 A.2d 570 (App.Div. 2000); State v. Walker, 322 N.J.Super. 535, 547-50, 731 A.2d 545 (App.Div.), certif. denied, 162 N.J. 487, 744 A.2d 1209 (1999); but see, State v. Edmonds, supra, 293 N.J.Super. at 118, 679 A.2d 725 (victim's in-court and out-of-court identifications were "glaringly inconsistent," requiring trial judge to tailor the charge to the facts of the case). However, after consideration of the entire record including the direct and cross-examinations of Iesha Barriento and Rasholi Woodard as well as the summation of counsel, we find that the abbreviated identification charge submitted to the jury in this case failed to satisfy the minimum requirement of State v. Green and was therefore plain error requiring reversal. See State v. Walker, supra, 322 N.J.Super. at 547, 731 A.2d 545.
Further trial error resulted from the comments of the prosecutor concerning defendant's post-arrest silence. Defendant was arrested on other charges on February 16, 1997, and was served on February 20, 1997, with the complaint related to the homicide. On March 10, 1997, defendant called the Vineland Police Department and subsequently advised them that on the night of the murder, February 14, 1997, he spent the night at his sister's home.
The prosecutor's cross-examination of defendant included the following exchange:
Q: Now, on March the 10th of 1997 you contacted Detective Negron and requested to speak with him; is that correct?
A: Yes, I did.
Q: And of that date you told Detective Negron that you had been at your sister, Yvonne's, apartment the night of February the 14th of 1997, and you didn't go out at all during that entire evening; isn't that what you told Detective Negron?
A: I don't recall the statement unless I see it.

. . . . .
Q: You hadn't told Detective Negron, or for that matter any member of the Vineland Police Department, until March the 10th of 1997 where you were on the evening of February 14th; is that correct sir?
A: That is correct.

[Emphasis added.]
No objection was taken to this line of questioning on cross-examination. The prosecutor re-called Detective Negron as a rebuttal witness and elicited that neither he nor any member of the Vineland Police Department had been told of defendant's whereabouts on February 14, 1997, until his interview with defendant on March 10, *147 1997. No objection was taken to the testimony.
In summation, the prosecutor commented as follows:

And let's remember what the testimony was. Not until March the 10th of 1997 did Carl Pierce indicate to Detective Negron or any other member of the Vineland Police Department that he couldn't have committed this crime because he was at the home of his sister the apartment of his sister on the night of February 14th. How reliable is that information, given the fact of the time lapse between February the 16th and March 10th when the decision was made to arrest Carl Pierce? You're talking about close to three weeks, 18 days. How reliable is that testimony that comes out almost three weeks later?
You know, common sense. Wouldn't common sense dictate to you that the first thing you would say to the Vineland Police is, "Oh, wait a minute. I couldn't have done it. February 14th. No. No, I was at my sister's house all that evening. And here's who else was there." Wouldn't common sense dictate to you that that's the first thing you would say? And not wait three weeks to bringor is it more reasonable, more logical, to suggest that the three-week period, the three-week hiatus, was necessary in order to come up with an alibi that would make sense? Let's think about it.

[Emphasis added.]
No objection was taken to these comments by the prosecutor. No curative instruction was requested, and none was given by the trial judge.
No inculpatory inference may be permissibly drawn from a defendant's decision to remain silent following his arrest. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); State v. Lyle, 73 N.J. 403, 416, 375 A.2d 629 (1977); State v. Deatore, 70 N.J. 100, 115, 358 A.2d 163 (1976); State v. Aceta, 223 N.J.Super. 21, 28, 537 A.2d 1317 (App.Div.1988). We stated in State v. Hyde, 292 N.J.Super. 159, 160, 678 A.2d 717 (App.Div.1996), that "silence will carry no penalty," and our Supreme Court held over two decades ago that:
a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not.
[State v. Deatore, supra, 70 N.J. at 115, 358 A.2d 163.]
The State argues that the comments of the prosecutor were proper in that they were directed to assert that defendant's alibi defense was a fabrication. This argument was specifically rejected by us in State v. Aceta, supra, 223 N.J.Super. at 31-32, 537 A.2d 1317. A defendant's right of silence is of constitutional dimension. No direct testimony or cross-examination is permitted to erode this right. A prosecutor may not comment as to defendant's post-arrest silence to impeach his exculpatory story at trial. State v. Deatore, supra, 70 N.J. at 115-16, 358 A.2d 163.
The comments by the prosecutor cannot be considered harmless error. This was a close case with substantial reliance upon identification testimony by an eyewitness who had a brief and traumatic encounter with the assailant and showed uncertainty in her description and identification. The claim of alibi was at the very heart of the defense case. This unfair broadside attack of the prosecutor taken together with the absence of any curative instruction was clearly capable of producing an unjust result and was, therefore, plain error.
We deem it unnecessary to comment on the other issues raised in light of our determination that the trial errors discovered require reversal and remand for a new trial.
Reversed.