194 N.J. Super. 326 (1984)
476 A.2d 884
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GEORGE OTTO FREY, III, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1984.
Decided June 14, 1984.
*328 Before Judges MATTHEWS, J.H. COLEMAN and GAULKIN.
Brian J. Neary, Designated Counsel, argued the cause for appellant (Joseph H. Rodriguez, Public Defender, attorney; Brian J. Neary, of counsel, and on the brief).
Michelle D. O'Shea, Assistant Prosecutor, argued the cause for respondent (John A. Kaye, Monmouth County Prosecutor, attorney; William J. Zaorski, of counsel, and on the letter brief).
PER CURIAM.
Defendant was found guilty of two counts of aggravated sexual assault, two counts of attempted aggravated sexual assault, one count of burglary, kidnapping, criminal restraint, terroristic threats, criminal coercion and aggravated assault. On the two aggravated sexual assault charges, he was sentenced to aggregate custodial terms of 30 years with 15 years of parole ineligibility. He was sentenced to concurrent terms on the remaining counts.
In this appeal defendant contends it was plain error for the court not to charge identification. Defendant was charged with, among other things, raping M.L.P. in the Linden Court Motel in Wall Township, New Jersey. The evidence presented at trial disclosed that the victim was asleep in her motel room when she was awakened by a noise in the bathroom. She observed a man in the bathroom in his shorts and then in the bedroom area of her room. As she attempted to escape from the room, the perpetrator dragged her to her bed. After threatening to kill her, he taped the victim's arms and eyes. While the victim's eyes and arms were taped, the perpetrator forced her to engage in various sexual acts. After the perpetrator left the room, the victim was able to free herself and summon help.
*329 M.L.P. also testified that she was able to see the perpetrator before her eyes were taped. The bathroom light remained on and the perpetrator was in her full view until her eyes were taped. Approximately one week after the episode, the victim made a photographic identification of defendant as the perpetrator. Thereafter, she picked defendant out of a lineup. The victim stated that she based her identification on the individual's weight, build, height, hair, shape of face, eyes and eyeglasses. There were no other eyewitnesses.
Defendant sought and obtained a pretrial Wade[1] hearing. The judge determined that the identification procedure was not impermissibly suggestive. Despite the obvious issue of identification of the perpetrator, the court failed to charge specifically the jury on that issue. The court, however, did charge the jury that "where the presence of the defendant at the scene of the crime is essential to show its commission by him, the burden of proving that presence beyond a reasonable doubt is upon the State."
Notwithstanding the failure of defense counsel to request an instruction on identification, it was the trial judge's responsibility to instruct the jury on all essential and fundamental matters. The absence of any eyewitness other than the victim and defendant's denial of guilt, made it essential for the court to instruct the jury on identification. Given the total circumstances surrounding the events under scrutiny and the limited period of time the victim was able to see the perpetrator before her eyes were taped, the potential for a mistaken identification becomes readily apparent. Also, tests indicated that hair, blood and saliva obtained from the scene of the crime did not conclusively match those samples obtained from defendant. Consequently, the short instruction to the jury on the need for the State to prove defendant's presence at the scene of the *330 crime was insufficient in this case involving many counts. The Model Jury Charge on identification instructs the jury on how to determine identification and the reliability of that identification. Here, the instructions as a whole fell far short of properly advising the jury on how to decide such a crucial issue. We are therefore persuaded that this was error which possessed the clear capacity to bring about an unjust result. State v. Green, 86 N.J. 281, 291-293 (1981); State v. Melvin, 65 N.J. 1, 18 (1974). This error requires reversal of the judgment.
Defendant further contends that the court committed reversible error when it permitted Investigator Coleman to testify that in her expert opinion there was evidence of sufficient acid phosphatase to establish recent vaginal penetration and ejaculation.
Investigator Coleman was employed in the Monmouth County Prosecutor's Office in the sex Crimes Unit. Her qualifications consisted of an associate's degree from Brookdale Community College, training in sex crimes analysis and investigation at the State Police Academy at Sea Girt and about seven seminars of varying lengths on sex crime investigation and analysis. To summarize, her training, education and experience were confined to interviewing sex crime victims, investigating these crimes, and collecting and preserving evidence for trial. The trial judge concluded "based on this witness's education, training and experience, that she's qualified as an expert in sex crime investigation and analysis and I'll permit her testimony as an expert."
Over objection of defense counsel, she was permitted to testify as an expert witness. The following colloquy highlights the objectionable testimony:
Q Miss Coleman, could you explain the  excuse me. When a man ejaculates, seminal fluid is emitted, correct?
A That's correct.
Q Now, could you explain to the jurors the composition of seminal fluid, please?
A The major component of it is acid phosphatase.
Q And can spermatozoa be found in seminal fluid?

*331 ....
A Yes, unless a man has had a vasectomy.
Q And the major component is acid phosphatase? Is that found in the vaginal canal of a woman?
A It can be, yes.
Q Could you tell us under what circumstances?
A Is created by a chemical imbalance in the system of the woman and there is a test to determine whether or not it is over and above. It would be very minimal.
Q Very minimal? What you mean by minimal?
A We're talking about zero to two percent of international liters. Anything above that is an elevation.
Q Anything above that possibly indicates seminal fluid was in the vaginal canal?
A That's correct.
Q How about spermatozoa? Is that ever found in the vaginal canal in a woman except for intercourse situations?
A No, with the exception of possibly your artificial insemination.
Q Have you had an opportunity to review what's been marked S-5, the hospital records, dealing with [M.L.P.]?
A Yes, I did.
Q Have you had an opportunity to determine whether or not spermatozoa was present in her vagina?
A Yes.
MR. WHITNEY: I have an objection to this type of examination. She's gone over medical reports and you could call the doctor to get this information.
THE COURT: Do you intend to call the doctor?
MRS. KENNEY: No, I don't. She's been classified 
MR. WHITNEY: I'm having the doctor 
THE COURT: She's basing her opinion  let me hear the question.
(Whereupon, the reporter read back the following question.)
"QUESTION: Have you had an opportunity to determine whether or not spermatozoa was present in her vagina?"
THE COURT: The hospital records, you stipulated to them. They're in evidence.
MR. WHITNEY: She's not a doctor, Judge.
THE COURT: I know. You stipulated to the records. She's just going to interpret the records for us. Overruled.
Q (Continuing) The records of gynecological specimens only 
A That's correct.
Q And what does that indicate on the hospital record as to the presence of spermatozoa in the vaginal canal of [M.L.P.]?
A It indicates that in fact spermatozoa were identified in two of the smears received.

*332 Q Was there also an acid phosphatase test for determination of the reading of the reports?
A Yes, there was.
Q And was there an indication on the reports as to the amount of acid phosphatase found in the system of Miss [M.L.P.]?
A That's correct. It was a 6.0 international units per liter.
Q Is that elevated level based upon your opinion and expertise?
A A very slight elevation.
Q Based on your experience, opinion, expertise, Miss Coleman, does the hospital records, which indicate the .6 [6.0] units liter and spermatozoa, does that given an opinion as to whether a penis had been inserted inside Miss [M.L.P.'s] vaginal canal?
A Yes, it does.
Q What is that opinion?
A Yes, there had been intercourse.
The record does not establish that Investigator Coleman possessed the requisite qualifications to give an opinion that there was evidence of recent intercourse. When the judge stated that she was going to merely interpret the hospital record, he misperceived the impact of her opinion. Without her opinion, the State presented no medical evidence of recent intercourse. The hospital record, absent her interpretation, only presented the results of various tests.
The State introduced no medical evidence of rape or recent vaginal intercourse despite the fact that the victim was taken to a hospital emergency room shortly after the episode. Dr. Krumermen, a pathologist called as a witness by defendant, testified that he tested physical evidence taken from the victim's vagina at the hospital. He was unable to conclude that there had been recent ejaculation into the victim's vagina. Nor did he find other evidence or recent vaginal intercourse. His conclusions were based on his medical judgment that the sperm level found in two PAP smears and the 6.0 acid phosphatase readings were too low. Dr. Krumermen, an eminently qualified and board certified pathologist, was undoubtedly not called as a witness by the State because his testimony would not benefit the State. Dr. Krumermen defined pathology as "laboratory analysis of patients' [body] specimen." Here, the judge permitted a police investigator to refute and contradict the clinical-medical *333 and scientific evidence offered by the pathologist. Seldom have we seen such damning evidence come from the lips of a person whose expertise has not been demonstrated. Her testimony was the linchpin in the State's case. Stated bluntly, a police investigator with an associate's degree, by that training and experience alone, is not qualified to interpret "laboratory analyses of patients' [body] specimen." See Evid.R. 56(2); State v. Cavallo, 88 N.J. 508, 517-518 (1982); Nesta v. Meyer, 100 N.J. Super. 434 (App.Div. 1968). We are persuaded that the testimony of Investigator Coleman constituted error which was not harmless and requires reversal. State v. McCloskey, 90 N.J. 18, 32 (1982).
We have carefully considered defendant's contention that the court erred by admitting out-of-court and the in-court identifications by the victim. This contention is clearly without merit. R. 2:11-3(e)(2). Finally, we decline to address defendant's contention of excessiveness of the sentence in view of our disposition.
For the reasons previously stated, the judgment of conviction is reversed. The matter is remanded to the Law Division for further proceedings. We do not retain jurisdiction.
NOTES
[1] This hearing was conducted pursuant to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).