873 A.2d 688 (2005)
377 N.J. Super. 612
STATE of New Jersey, Plaintiff-Respondent,
v.
Herman L. GAINES, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 2004.
Decided May 26, 2005.
*690 Robert L. Sloan argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Sloan, of counsel and on the brief).
Jeanne Screen, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Ms. Screen, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges SKILLMAN, COLLESTER and GRALL.
The opinion of the court was delivered by
GRALL, J.A.D.
Defendant Herman L. Gaines appeals from a final judgment of conviction and sentence, and the State cross appeals from the merger of defendant's convictions. A jury convicted defendant of aggravated manslaughter contrary to N.J.S.A. 2C:11-3a; possession of a weapon with an unlawful purpose contrary to N.J.S.A. 2C:39-4a; and possession of a handgun without a permit contrary to N.J.S.A. 2C:39-5b. The judge merged defendant's conviction for violation of N.J.S.A. 2C:39-5b with his conviction for violation of N.J.S.A. 2C:39-4a and imposed the following sentences: on aggravated manslaughter, a thirty-year term of incarceration, eighty-five percent of that term without possibility of parole, followed by a five-year term of parole supervision, N.J.S.A. 2C:43-7.2; and, on possession of a handgun with an unlawful purpose, a ten-year term, five years without possibility of parole, concurrent with the sentence on aggravated manslaughter. The judge also imposed a $1,000 VCCB assessment, a $150 SNSF assessment and a $30 LEOTEF penalty.
On August 15, 1998, fifteen year old Kevin Hill was shot and killed at a high school graduation party held in a backyard on Irvington Street in Franklin Township. By all estimates, there were well over two hundred people in attendance. The guests moved between the graduation party and a birthday party hosted in the adjoining backyard of the graduate's next-door neighbor. When Hill was shot he was standing near a chain link fence that spanned the rear border of both yards and separated them from the backyards of homes fronting on Hillside Street. There was a dense, but not continuous, border of bushes, vines and trees on the Irvington Street side of the fence.
Shameera Boston, then twelve years old, had danced with Hill and was standing in front of him, with her back to him. She heard a sound like a balloon popping and looked to the bushes at her side. She then heard a second noise and saw a flash. She saw defendant in the bushes. She knew defendant and recognized him; he was her mother's friend. Defendant's arms were up and his right arm was out in front of him, hand turned up. As he lowered his arm she heard a "heavy drop" in the bushes. She fell on top of Hill.
Nefitia Bridgeforth, Boston's cousin, was four or five feet from Hill when she heard a gunshot and saw sparks from the bushes. Like Boston, she saw defendant. She had known defendant for seven or eight years and had no doubt that it was him. He was holding a revolver. Bridgeforth could not tell whether he was pointing the gun at Hill. She got down on the ground.
As the other guests started to run from the backyard, Boston left with her sister, and Bridgeforth ran to the front yard. Stacey and Jason Gaines, defendant's uncles, stopped her and asked where defendant was. As the crowd dispersed, Bridgeforth heard shots in the street, which she described as sounding like "up *691 in the air" shots. Neither Boston nor Bridgeforth stayed to report what they had seen. There were no reports of additional shots in the backyard or on Hillside Street.
A police officer who arrived at the scene after the shooting described what he saw and heard as "panic," cars pulling away and people running and pushing. He worked his way toward the rear of the backyard where a man was trying to administer CPR to Hill. Although the officer could not find Hill's pulse, he assisted until paramedics arrived. Efforts to revive Hill at the hospital were not successful.
The medical examiner who performed Hill's autopsy concluded that the fatal bullet was fired from a gun held higher than Hill's shoulder and passed through wood before it hit Hill. There were splinters of wood around the bullet hole on Hill's shirt, and the entry wound was above his left collar bone. The wound was oval in shape, indicating that the bullet was tumbling, not traveling straight, when it struck Hill. By the time the bullet reached Hill, it was breaking apart. The doctor found a piece of the bullet jacket on Hill's skin and several fragments of the bullet's lead and jacket inside his body along the bullet's path, which was from left to right, front to back, and up to down. Hill was six feet and one inch tall. The doctor referred to the unknown wooden object as the shooter's secondary target, explaining that a secondary target is an object through which a bullet passes en route to the shooter's primary target. When asked, the doctor agreed that a tree branch, or some other wooden object, could have been the shooter's primary target.
There was a tree in the backyard yard in which the party was held. Its branches covered a fairly large area, at least to the edge of the backyard fence.
One of the fragments of the bullet jacket the medical examiner recovered was sufficiently large to permit its identification as a .44 caliber bullet. That fragment also bore sufficient markings to identify the gun from which it was fired, but the police did not find that gun until March 2000.
On March 5, 2000, a man was arrested with a .44 caliber revolver. An officer investigating reports of gunshots stopped Otis Burrell and saw a revolver under the seat of his car. Burrell admitted he had fired into the air twice for no reason. The officer seized the handgun. A ballistics expert later identified the revolver as the gun used to fire the bullet that killed Hill.
The gun had several owners. Burrell got it from Scott, and Scott got it from Dillon. Dillon obtained the gun from Jason Gaines, defendant's uncle.
On March 15, 2000, investigators asked Bridgeforth, Dillon's girlfriend, about the graduation party, the gun and where they might find Dillon. She did not tell them that she saw the gun at the party. On March 16, 2000, she agreed to give a sworn statement about what she had seen on the night Hill was shot. It was the first time she reported that she saw defendant in the bushes with a gun. She also gave the investigators Boston's name, indicating that she too was in the area when Hill was shot. At trial, Bridgeforth testified that she fabricated the statement because of pressure from the police. Her sworn, recorded statement was admitted into evidence pursuant to N.J.R.E. 803(a)(1)(A). Despite Bridgeforth's recantation, she did not claim that the police gave her defendant's name and acknowledged that the officers did not threaten to charge Dillon with the homicide.
The jury heard extensive testimony about Bridgeforth's reasons for making her statement, her attempts to retract it prior to trial and her contacts with defendant *692 and members of his family after she implicated him. She and Boston both testified that they had not had any contact with one another since the party.
Only one witness, Danielle Pierson, provided evidence about Hill's motive. Pierson did not attend the graduation party, but defendant later told her that he shot Hill by accident, intending to kill Dishon Page. Pierson did not report what defendant told her about shooting Hill until investigators contacted her because she had given them false information.
According to defendant, he left the party before the shooting and did not have a gun with him that night. He had heard of Dishon Page but did not know him, and he believed that Pierson made up a lie about him because he had ended their relationship. He admitted that he called Bridgeforth and told her she would be helped if she got in trouble for retracting her statement implicating him.
Several partygoers testified on defendant's behalf. Latita Mendez danced with Hill, and Erica Davies saw them dancing. Mendez claimed she was the only one to dance with Hill, but she also said that she left Hill to get a soda and returned after he was shot. Mack, Auten and Harris were in the backyard and did not see either defendant or a muzzle flash when Hill was shot. The homeowner did not see a flash and said her yard was dark. The only lights were on the deck. No footprints were found in the bushes by the fence. Page was at the party, but he was in the front not the backyard most of the time.
Although the defendant was charged with murder, on the basis of the foregoing evidence, the trial judge instructed the jury on the lesser included crimes of aggravated and reckless manslaughter. The jury acquitted defendant of murder and convicted him of aggravated manslaughter and possessing the .44 caliber handgun with the purpose of using it unlawfully against another and without a permit.
Defendant's attorney raises five issues on appeal. He argues:
I. WHERE THE STATE'S EVIDENCE INDICATED A PURPOSEFUL SHOOTING AND DEFENDANT DENIED ANY INVOLVEMENT, THE PROVISION OF JURY INSTRUCTIONS (OVER OBJECTION) ON LESSER INCLUDED OFFENSES OF MURDER BASED ON RECKLESSNESS HAD NO SUPPORT IN THE RECORD AND DEFENDANT'S CONVICTION OF AGGRAVATED MANSLAUGHTER WAS OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMEND. XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10.
III. THE JUDGE'S FAILURE TO PROVIDE A SPECIFIC JURY INSTRUCTION ON IDENTIFICATION DEPRIVED DEFENDANT OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMEND. XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10.
[At the court's direction, its recitation and discussion of points II, IV and V of the brief, the nine issues raised by defendant pro se, and the issues raised in supplemental letters and on the State's cross appeal have been omitted from the published opinion.]
For the reasons set forth below, we affirm defendant's convictions and remand for resentencing.

*693 I.
The trial court properly submitted the crime of aggravated manslaughter for the jurors' consideration. The crime was clearly indicated by the evidence, and "a trial court has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." State v. Jenkins, 178 N.J. 347, 361, 840 A.2d 242 (2004); N.J.S.A. 2C:1-8e.
Murder requires proof that defendant caused death purposely, i.e., with the intent to cause or conscious object of causing death, or knowingly, i.e., with an awareness that death is practically certain to result. State v. Cruz, 163 N.J. 403, 417, 749 A.2d 832 (2000). By operation of the doctrine of transferred intent, murder is also established by proof that the defendant acted to purposely or knowingly kill one victim but caused the death of another instead. State v. Worlock, 117 N.J. 596, 616, 569 A.2d 1314 (1990); N.J.S.A. 2C:2-3d. Aggravated manslaughter requires proof that the defendant caused death and "was aware of and consciously disregarded a substantial risk of death, i.e., a probability that death would result, and that the defendant manifested extreme indifference to human life." Cruz, supra, 163 N.J. at 417, 749 A.2d 832.
Thus, under Jenkins, Cruz, and Worlock, the propriety of the judge's decision to submit the crime of aggravated manslaughter to the jury depends on whether the evidence clearly indicated a basis for finding that defendant fired the gunshot that killed Hill consciously disregarding a probability of causing the death of a person in the backyard but without an awareness that it was practically certain that someone would die as a result. See Jenkins, supra, 178 N.J. at 361, 840 A.2d 242; Cruz, supra, 163 N.J. at 417, 749 A.2d 832; Worlock, supra, 117 N.J. at 616, 569 A.2d 1314. Direct proof of a defendant's mental state is not required. His awareness of the probability or practical certainty of a result, like willfulness or intent, may be inferred from the circumstances and his conduct. See State v. Siegler, 12 N.J. 520, 524, 97 A.2d 469 (1953).
The medical examiner's testimony about the physical evidence provided a clear basis for a verdict acquitting defendant of murder and convicting him of aggravated manslaughter. Based on that evidence, the jury could find that defendant raised the gun, aimed at a branch, and fired above the crowd, not into it. Given the size of the group, the jurors could have concluded that he fired under circumstances manifesting extreme indifference to human life, consciously disregarding a probability but unaware of a practical certainty of causing the death of a person below.
In arguing that the testimony of Bridgeforth, Boston and Pierson compelled either a conviction of murder or an acquittal and did not permit conviction of aggravated manslaughter, defendant overlooks the evidence that supports a finding that he fired at and hit a wooden object above the crowd. Jurors are free to believe some, all or none of a witness' testimony, State v. Ernst, 32 N.J. 567, 583, 161 A.2d 511 (1960), cert. denied, 364 U.S. 943, 81 S.Ct. 464, 5 L.Ed.2d 374 (1961), and have a responsibility to evaluate testimony in light of the physical evidence. Thus, the jurors were free to accept Boston's and Bridgeforth's testimony about his firing of the gun (neither woman saw him aim and fire, they saw him in the light of the muzzle flash), and reject Pierson's testimony about defendant's intention. The splinters on Hill's shirt, the location of the entry wound and the path of the bullet in *694 his body supported a finding that he did not fire at a particular person or into the group. That physical evidence distinguishes this case from those in which a defendant shoots directly into a crowd or directly at another person, conduct which this court has concluded defeats an inference that the shooter was not aware that death was a practical certainty. See State v. Mendez, 252 N.J.Super. 155, 160-62, 599 A.2d 565 (App.Div.1991), certif. denied, 127 N.J. 560, 606 A.2d 371 (1992); State v. Sanchez, 224 N.J.Super. 231, 242-43, 540 A.2d 201 (App.Div.), certif. denied, 111 N.J. 653, 546 A.2d 561 (1988). In this case, the evidence supported a finding that defendant's target was an object that did not stop but deflected or failed to hold the bullet. That conduct under these circumstances permits an inference of extreme indifference toward, and conscious disregard of a probable risk to, human life.
Where as here, the evidence permits a finding that the defendant was aware of and disregarded a probability but not a practical certainty that his conduct would cause death, the crime of reckless manslaughter and extreme indifference reckless manslaughter should be submitted to the jury. A defendant's state of mind, i.e., the question of his or her awareness of a probability or practical certainty is one for the jury. A defendant's state of mind may be inferred from but not presumed on the basis of consequences that are likely. See Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); State v. Love, 245 N.J.Super. 195, 198-99, 584 A.2d 847 (App.Div.), certif. denied, 126 N.J. 321, 598 A.2d 881 (1991). The judge did not err in presenting the issue to the jury.

II.
We also conclude the judge's failure to give a specific charge on identification, sua sponte, does not amount to plain error requiring reversal of defendant's conviction. Defendant did not request the instruction either during the conference on the jury charge or after the judge delivered the charge. Boston's and Bridgeforth's identifications of defendant as the shooter were critical to the State's case and the veracity of their identifications was a "key" issue at trial. "[A]s a matter of general procedure a model identification charge should be given in every case in which identification is a legitimate issue." State v. Davis, 363 N.J.Super. 556, 561, 833 A.2d 1094 (App.Div.2003). "When identification is a `key issue,' the trial court must instruct the jury on identification, even if a defendant does not make that request." State v. Cotto, 182 N.J. 316, 325, 865 A.2d 660 (2005). In the absence of a request for the charge, we do not presume prejudice but review the charge and the corroborative evidence to determine whether the deficiency was harmless, clearly incapable of producing an unjust result. See id. at 326-27, 865 A.2d 660; State v. Green, 86 N.J. 281, 290-91, 430 A.2d 914 (1981).
In order to identify any deficiency in the charge given, we consider the purposes of a jury instruction on identification. In State v. Green, the Supreme Court identified the following three: highlighting the State's obligation to prove beyond a reasonable doubt that defendant is the perpetrator of the crime; emphasizing that defendant has no obligation to prove that he was elsewhere or to identify the culprit; and guiding the jurors' evaluation of eyewitness testimony. Id. at 293-94, 430 A.2d 914.
In Green, the victim was attacked at night by an assailant who remained behind her while they walked to the spot where he raped her. Id. at 291, 430 A.2d 914. There was no evidence of any light in that *695 area. Ibid. Her initial description of the assailant was of a man five inches shorter and thirty pounds lighter than defendant; it did not refer to defendant's chipped tooth, a detail she provided several months after the assault. Ibid.
On those facts, the Supreme Court found the danger of mistaken identification to be "particularly significant." Ibid. The Court also found that the judge's instruction to the jury "repeatedly referenced defendant by name, implying that defendant was in fact the man who approached [the victim] on the night of the crime." Id. at 292, 430 A.2d 914. Under the circumstances, the majority found an instruction that simply informed the jury of the State's obligation to prove the defendant's "participation" to be inadequate, id. at 294-95, 430 A.2d 914 (Sullivan, J., dissenting), and deemed the judge's failure to honor the request for an identification charge prejudicial. Id. at 291, 294, 430 A.2d 914; cf. State v. Salaam, 225 N.J.Super. 66, 69, 541 A.2d 1075 (App.Div. 1988).
In State v. Cotto, the Court addressed a claim of plain error based on failure to give the standard Model Jury Charge on identification. Cotto, supra, 182 N.J. at 326-27, 865 A.2d 660. That case involved a burglary and robbery perpetrated by the victim's former boyfriend. Id. at 327, 865 A.2d 660. The Court considered the abbreviated identification charge approved by this court for use in cases involving weak identification arguments, Davis, supra, 363 N.J.Super. at 562, 833 A.2d 1094, and found no error because the judge had charged the jury on the "State's burden of proving the defendant's presence at the scene of the crime and his participation in the crime." Id. at 326, 865 A.2d 660. The Court held that this instruction, which clearly informed the jury of the State's "burden of proving beyond a reasonable doubt that defendant is the wrongdoer" was adequate in that case, even though the judge did not use the word "identification" or give a "more detailed explanation." Id. at 326-27, 865 A.2d 660.
While the instruction in this case did not include a separate, explicit reference to the State's obligation to prove that defendant was the culprit, it included repeated, specific references to the State's obligation to prove beyond a reasonable doubt that defendant was the person who killed Kevin Hill. The judge explained: "To find defendant guilty of aggravated manslaughter, the State is required to prove . . . that the defendant caused Kevin Hill's death; and two, that the defendant did so recklessly; and three, that the defendant did so under circumstances manifesting extreme indifference to human life." Elaborating on causation, he instructed: "You must find that Kevin Hill would not have died but for the defendant's conduct." He concluded, "[If] after consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant recklessly caused Kevin Hill's death under circumstances manifesting extreme indifference to human life, you must find the defendant not guilty of aggravated manslaughter." The judge opened his charge to the jurors by explaining that defendant was presumed innocent and had no obligation to prove or offer any proof relating to his innocence.
Read as a whole, State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973), this jury instruction did not permit the jurors to conclude that they could convict defendant if the State had not established beyond a reasonable doubt that he was the person who fired the fatal shot. Cotto, supra, 182 N.J. at 327, 865 A.2d 660. Thus, while we conclude that the judge erred in failing to give the abbreviated model charge we approved in Davis, we are confident that the instruction given *696 informed the jury of the State's obligation to prove that defendant was the person who killed Hill.
The strength and quality of the State's corroborative evidence rendered the deficiencies in the instruction harmless. Ibid.; State v. Frey, 194 N.J.Super. 326, 329, 476 A.2d 884 (App.Div.1984). Boston and Bridgeforth both gave statements identifying defendant as the shooter, and their independent identifications corroborate one another. See id. at 325-26, 476 A.2d 884 (identification is a key issue particularly in cases where the State relies on a single eyewitness). Both women knew defendant. Their independent identifications of him were not dependent upon their ability to observe and recall physical features and characteristics of a person who was a stranger to them. Cf. Green, supra, 86 N.J. at 291, 430 A.2d 914; Frey, supra, 194 N.J.Super. at 329, 476 A.2d 884. Rather, their identifications were based on their ability to recognize a person they knew personally. See Cotto, supra, 182 N.J. at 327, 865 A.2d 660. Boston and Bridgeforth had no contact with one another between the night of the crime and their independent identifications. They gave their statements in different counties to different investigators. Concern about collaboration was minimal.
The women's mutually confirming identifications were further corroborated by Pierson, who testified that defendant told her he shot Hill by accident. In addition, Bridgeforth described the gun defendant held, a description that was consistent with the revolver linked to this crime by forensic evidence. Although Bridgeforth retracted her statement identifying defendant, her recantation was not based on doubt about the accuracy of the identification. It was based on her claim that she had seen nothing and simply fabricated the entire account. The question about her identification was one of motivation, bias and inconsistency, not reliability of the identification. The judge's charge to the jury thoroughly covered these factors, and it included a standard instruction directing the jurors to consider a witness' ability to observe in evaluating credibility.
Considering the corroborating evidence in light of the issues in dispute and the charge as a whole, we conclude that the deficiency in this instruction was clearly incapable of producing an unjust result and harmless error. Cotto, supra, 182 N.J. at 326-27, 865 A.2d 660; State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
Defendant's convictions are affirmed and the matter is remanded for resentencing.