**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3699-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SHADON M. MCDOWELL,
a/k/a SHADON MARCELLO,
EUGENE MCDOWELL,
SHADOW M. MCDOWELL,
and SHADONMAR E. MCDOWELL,

     Defendant-Appellant.

_____

Argued March 3, 2026 – Decided March 19, 2026

Before Judges Chase and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Warren County, Indictment No. 22-02-0057.

Rebecca Billig, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rebecca Billig, of counsel and on the briefs).

Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney

General, attorney; Paul H. Heinzel, Deputy Attorney
General, of counsel and on the brief).

PER CURIAM

Defendant Shadon McDowell appeals from his conviction and sentence[1] after a jury trial. For the reasons that follow, we reverse and remand for a new trial.

I.

We glean the salient facts from the record. In February 2022, a grand jury returned an indictment charging defendant with two counts of third-degree distribution of heroin, N.J.S.A. 2C:35-5(a)(1), and two counts of second-degree distribution of heroin within 500 feet of a public park, N.J.S.A. 2C:35-7.1(a). A two-day jury trial was held in January 2024.

The charges stem from two controlled buys set up by Detective Brett Marino of the Phillipsburg Police Department, with a cooperating witness ("CW") in July 2021. Marino described that a "controlled buy" occurs when a CW or undercover police officer is involved in a transaction where they are sent in to purchase drugs from a suspect.

---

[1] The State concedes that the sentence was illegal and requires a new sentencing hearing; however, because we are remanding for a new trial this issue need not be addressed.

A-3699-23

Detective Marino testified that this investigation began when the CW informed him that someone by the name of "Big Rob," was selling drugs out of a house on Mercer Street in Phillipsburg. He was then asked by the prosecutor who "Big Rob" was and if he was in court, to which Detective Marino answered "Shadon McDowell," and that he was "right over [t]here in the light blue shirt with the blue tie." Defense counsel did not object, and the identification was entered into the record by the court.

According to Detective Marino, he set up the controlled buys by having the CW make "a phone call to Shadon," to arrange for the purchase of heroin from defendant at the Mercer Street Park. Detective Marino explained that on the day of the first controlled buy, the CW was searched to make sure that he did not have drugs on him and then he was provided a recording device and money that had previously been photographed by the detectives. Detectives then instructed the CW "to walk from our vehicle or wherever we may be sending him from directly to the meeting location without stopping or talking to anybody . . . that after the buy, that he will meet directly back up with us without stopping and meeting up with anybody."

Detective Marino stated that after he dropped the CW off to walk to the park, he observed defendant leaving the Mercer Street address. Marino testified

3

that he did not observe the transaction. Marino testified that the CW returned and gave him fifty wax folds of drugs that he had purchased, and then he searched the CW but the money they had given him was gone.

Subsequently, Detective Marino had the CW call and set up a second controlled buy. Detective Marino stated that the CW was prepared the same way for the second transaction as the first, and that upon completion the CW returned with eleven wax folds of drugs "he had just purchased from Shadon." Detective Marino did not see the transaction but testified that the CW was under constant surveillance and did not speak to anyone else. Detective Marino stated that the State's laboratory tested the substances the CW purchased on both occasions, which both parties stipulated was heroin.

On cross-examination, Marino testified that during both controlled buys, the CW had a cell phone equipped with an earpiece, that allowed the officers to hear, record, and transcribe the transaction. Marino stated that the transcripts from the first controlled buy indicated there was a conversation started by the CW, but that the rest was inaudible. As to the second controlled buy, Marino testified that transcript did not indicate a conversation between the CW and defendant because "there's really no[thing] audible besides hello."

A-3699-23

Detective Marino testified that he participated in defendant's arrest a week or so after the second controlled buy. He stated he searched defendant incident to his arrest and that no drugs or money were found on his person. On cross-examination, Detective Marino stated that a search of the Mercer Street home did not produce the money, any drugs, or drug paraphernalia, including scales, or packaging agents. Detective Marino further testified that the CW was in custody, with pending charges, on the day he agreed to the controlled buys; but that the CW was not promised anything by Marino in exchange for making the controlled buys.

Next, Sergent Joseph Cecere, of the Hackettstown Police Department testified that in the summer of 2021 he was assigned to assist Detective Marino in investigating defendant. Sgt. Cecere testified that he was directed to observe both controlled buys at Mercer Park and stated that he had an unobstructed view. The following exchange then took place, without objection from defense counsel:

> PROSECUTOR: And did you observe a transaction involving Mr. McDowell?
>
> CECERE: Yes Sir, I did.
>
> PROSECUTOR: Is Mr. McDowell present in court?
>
> CECERE: Yes Sir.

5

A-3699-23

PROSECUTOR: Where is he seated?

CECERE: At the defense table.

. . . .

THE COURT: Let the record reflect that the witness identified the defendant sitting at defense counsel table. Thank you.

Sgt. Cecere further testified that he was in a vehicle both times, parked in a lot across the street from Mercer Park. Sgt. Cecere testified for the first controlled buy he observed the CW sit on a bench and wait for defendant, and when defendant showed up, they "briefly" sat together, exchanged something, then defendant left. For the second controlled buy, Sgt. Cecere stated that the CW waited on a set of swings, got off the swing when defendant arrived, and the two made an exchange to the right of the swing set, then "parted ways." Sgt. Cecere stated that during both controlled buys he did not see the CW interact with anyone else except defendant.

On cross-examination, Sgt. Cecere stated he did not know the exact distance he was from the location of the controlled buys but estimated "I was a little bit further from where I'm sitting now to the back of the courtroom." During recess a map of the court was examined, and the distance referenced by Sgt. Cecere was determined to be sixty-two feet. Sgt. Cecere also stated he had

6

A-3699-23

a cell phone with him at both controlled buys, but he did not record the transactions, nor did he take pictures or audio recordings during them.

The CW testified that he remembered assisting the police in the controlled buys but did not recall from whom he was asked to purchase the heroin. The CW stated he met with detectives prior to the controlled buy and stated the detectives "[j]ust told me to call somebody and buy some dope." The CW testified that the detectives provided him with a phone, headphones, and money with which to purchase the drugs.

On cross-examination, the CW testified that he was a drug addict at that time and had been using heroin for approximately fifteen years. The CW stated he was arrested on the same day the officers approached him to make the controlled buys, on unrelated pending drug charges. The CW stated he was released from custody on that day for agreeing to make the two controlled buys, and that he was never brought back into custody on those charges.

The CW further testified that he was familiar with Mercer Street, and that he had seen the person he referred to as "Big Rob" prior to the two controlled buys, but that he did not know "Big Rob's" actual name. The CW testified because he was heavily into drugs at that time it affected his memory.

A-3699-23

On redirect, the CW answered that he was currently sober, and in custody on unrelated charges. The CW estimated that he had purchased heroin more than 500 times and that it was common for him to not know the actual name of the dealer he purchased from, but it was common for the dealers to use street names. The CW never identified defendant in court.

Last to testify was Officer Teddy Garcia of the Warren County Prosecutor's Office. Officer Garcia stated he participated in the first buy and that his role was to prepare the CW and then set up in position to watch the transaction. Officer Garcia testified that he had an unobstructed view and observed that the CW "met with Shadon McDowell, an exchange happened, and then they parted ways." Garcia was then asked "[w]hen you say Shadon McDowell, is that person in court right now," to which Garcia answered "[y]es, he's sitting right there." The court then stated, "[l]et the record reflect that witness identified the defendant sitting at counsel table."

Officer Garcia further testified that from his position he could see the entire park, and that he was parked on the street about 90 to 120 feet from the location of the controlled buy. On cross-examination, Officer Garcia stated his only role was to observe the transaction, and that he kept the CW in his view the entire time until the CW met up with Detective Marino after the controlled buy

A-3699-23

took place. Officer Garcia testified that he did not make any type of recording or photographs.

On the second day of trial, after closing arguments, the jury was charged. Despite having the opportunity, defense counsel never requested the model jury charge for in-Court identifications be included. That day, the jury returned with a guilty verdict on all counts.

Defendant was sentenced in June 2024. The court granted the State's motion for an extended sentence, pursuant to N.J.S.A. 2C:43-6(f), and sentenced defendant to: six years' incarceration with a three-year period of parole ineligibility on counts I and II; and twelve years with a five-year period of parole ineligibility on counts III and IV. All sentences were ordered to run concurrently.

Defendant appeals his conviction, raising the following arguments:

> POINT I: [DEFENDANT] WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT PERMITTED THE STATE TO ELICIT THREE FIRST TIME IN COURT IDENTIFICATIONS IN DIRECT CONTRAVENTION OF THE PROCEDURES MANDATED BY STATE v. WATSON, 254 N.J. 558 (2023).
>
> POINT II: [DEFENDANT] WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON

HOW TO ASSESS THE RELIABILITY OF THE THREE FTIC IDS.

POINT III: [DEFENDANT] WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT ALLOWED THE LEAD DETECTIVE TO IMPLY TO THE JURY THAT [DEFENDANT] WAS VIOLENT.

POINT IV: THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL.

POINT V: [DEFENDANT'S] SENTENCES ARE ILLEGAL.

## II.

We now address the arguments raised by defendant, reordering them for ease of discussion.

## A.

Defendant contends that the trial court committed plain error for failing to sua sponte provide the model jury instruction related to eye-witness identification. "It is a well-settled principle that appropriate and proper jury charges are essential to a fair trial[,]" and that a jury charge functions as a "'road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations.'" State v. Savage, 172 N.J. 374, 387 (2002) (first citing State v. Collier, 90 N.J. 117, 122 (1982) (internal citation omitted) and then quoting State v. Martin, 119 N.J. 2, 15 (1990)).

10

In this instance, defendant did not request an eyewitness identification instruction. "When a defendant fails to object to an error or omission [about a jury charge] at trial, we review for plain error. Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Reversal is warranted only where an error raises "a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)). "The mere possibility of an unjust result is not enough." Ibid. A jury instruction is particularly "crucial to the jury's deliberations on the guilt of a criminal defendant[,]" and "'[e]rrors [having a direct impact] upon these sensitive areas of a criminal trial are poor candidates for rehabilitation' under the plain error theory." State v. Jordan, 147 N.J. 409, 422-23 (1997) (quoting State v. Simon, 79 N.J. 191, 206 (1979)).

When a defendant does not object to the charge, "there is a presumption that the charge was not error and was unlikely to prejudice . . . defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)). Failure to interpose a timely objection constitutes strong evidence that the belatedly raised error was of no moment. State v. Tierney, 356

11

N.J. Super. 468, 481-82 (App. Div. 2003). However, the failure to provide the eyewitness identification instruction may constitute reversible error even when that instruction is not requested. See State v. Cotto, 182 N.J. 316, 326 (2005).

In State v. Davis, we reversed the defendant's conviction finding the absence of an instruction on identification amounted to plain error, despite general jury instructions given, pertaining to credibility, the elements of the charged crimes, and the State's burden. 363 N.J. Super. 556, 558, 561 (App. Div. 2003). The defendant in Davis was convicted of distributing cocaine within 100 feet of a school after selling to a DEA officer, and "his defense was squarely one of misidentification." Id. at 559. The DEA agent had never met the defendant, and when backup officers tried arresting him, he fled on foot. The DEA officer was shown a single photograph by a detective around twenty-five minutes after the sale/interaction with the defendant and identified defendant. Ibid. From the start, defense counsel argued for misidentification but did not specifically request a charge on identification. Id. at 560-61.

After reinforcing that the State was obligated to prove the defendant's identification beyond a reasonable doubt, we further opined "[a] jury is at liberty to reject a meritless defense, but trial courts are not at liberty to withhold an instruction[]." Id. at 561-62. Moreover, we stated, "[w]hile it is possible that

the corroborative evidence against a defendant may be sufficiently strong that the failure to give an identification instruction does not constitute plain error . . . . as a matter of general procedure a model identification charge should be given in every case in which identification is a legitimate issue." Id. at 561 (internal citation omitted).

In State v. Henderson, our Supreme Court addressed pre-trial out-of-court identifications. 208 N.J. 208, 222-24 (2011). Citing developments in science, the Court stated, "that memory is malleable, and that an array of variables can affect and dilute memory and lead to misidentifications." Id. at 218; see also Watson, 254 N.J. at 585 (noting the "lengthy delay between the time of the offense and the identification inevitably allows for memory to decay.") The Henderson Court directed that new jury instructions be developed. 208 N.J. at 298-99. The following year, the Court approved new model jury charges on eyewitness identification, which addressed various factors like memory decay, stress, and the duration of the crime. See Model Jury Charge (Criminal), "Identification: In-Court and Out-Of-Court Identifications" (rev. July 9, 2012); see also Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020).

13

In <u>State v. Sanchez-Medina</u>, our Court also reviewed a "missing instruction on identification . . . for plain error." 231 N.J. 452, 468 (2018). In <u>Sanchez-Medina</u>, the Court reaffirmed that "[w]hen eyewitness identification is a 'key issue,' the trial court must instruct the jury how to assess the evidence— even if defendant does not request the charge." <u>Id.</u> at 466 (citing <u>Cotto</u>, 182 N.J. at 324).

The issues defendant presented to the jury were whether he was "Big Rob" and whether it was him who sold the heroin. The CW averred that after being approached by law enforcement on the same day he was arrested for an unrelated drug charge, he told the officers that someone named "Big Rob" was selling drugs out of a house on Mercer Street but conceded he did not know "Big Rob's" actual name. Further, although the CW testified that he had seen "Big Rob" in the past, he did not identify McDowell as "Big Rob" at trial.

Moreover, the arresting officer, Detective Marino, did not observe either of the two controlled buys, he only witnessed defendant leaving the Mercer Street address on both occasions. There are no photographs or video recordings of the controlled buys, and the audio recording from the phone the CW was provided was inaudible. Additionally, the search incident to defendant's arrest did not turn up any physical evidence that McDowell was selling drugs. There

A-3699-23

were no drugs, or drug paraphernalia, in defendant's home, nor did the search turn up the photographed money that the CW was given by the detectives for the controlled buys.

As we pointed out in State v. Frey, where identification was a key issue, "[n]otwithstanding the failure of defense counsel to request an instruction on identification, it was the trial judge's responsibility to instruct the jury on all essential and fundamental matters." 194 N.J. Super. 326, 329 (App. Div. 1984). The question before the jury was whether it was this defendant who sold the heroin to the CW. Despite defense counsel not requesting a model jury charge on identification, it nonetheless should have been provided, and not doing so raises reasonable doubt as to whether the jury reached a result it might otherwise not have reached. Therefore, defendant's conviction is reversed and retrial is required.

B.

Because we have found that there was a violation of defendant's right to a fair trial that requires reversal of the convictions, we address defendant's remaining arguments concerning evidence rulings only to the extent they present issues that may arise on retrial.

15

We review evidentiary rulings for an abuse of discretion. <u>Watson</u>, 254 N.J. at 602. However, we afford no deference to questions of law, such as those interpreting constitutional rights. <u>State v. McInerney</u>, 450 N.J. Super 509, 521 (App. Div. 2017).

i.

First, we address defendant's claim that the three first-time in-court identifications were improper because the procedures set forth in <u>Watson</u> were not followed. Our Court has explained that trial courts must "take steps to guard against practices that pose serious due process concerns—especially inside a court of law in front of a jury." <u>Watson</u>, 254 N.J. at 586. "By conducting a suggestive identification procedure in a courtroom, the State may implicate due process concerns and deprive defendants of their due process rights in a way that neither cross-examination nor jury instructions can adequately address." <u>Ibid.</u>

In <u>Watson</u>, a defendant was on trial for a bank robbery. 254 N.J. at 568. At trial, without first notifying the defendant, the State elicited a first-time in court identification, from a bank teller, who identified the defendant as the robber, stating they were "maybe like . . . 80 percent' sure"; the defense failed to object. <u>Id.</u> at 572. Defendant's former girlfriend also testified, and identified

defendant, with 100 percent certainty, from two still photos she was shown from a bank surveillance video.  Ibid.

The Court found the teller did not have a prior relationship with defendant or know him from before; thus, "[t]here was no 'good reason' for the State to conduct a first-time in court identification."  Id. at 589.  Moreover, the Court held, "[t]he extremely suggestive in-court identification in this case therefore should not have taken place."  Ibid.  Because defendant's identification was "central to the case, the error raised a reasonable doubt as to whether the jury reached a result it otherwise might not have."  Id. at 590-91 (citations omitted). Thus, the Court held there was plain error and reversed defendant's conviction.

Furthermore, the Court prospectively held that "the State must file a motion in limine if it intends to conduct a first time in court identification procedure."  Id. at 588.  At the motion, the parties and the court must explore whether good reason exists to conduct a first-time in-court identification.  Id. at 587-88.  Lastly, the Court determined that "any hearing on the admissibility of an in-court identification should be held and the issue should be resolved before the start of the trial."  State v. Burney, 255 N.J. 1, 27 (2023) (citing Watson, 254 N.J. at 587-588).

17

The State argues that because all three officers were part of one surveillance team, we should aggregate their observations and find that their in-court identifications were confirmatory. Furthermore, the State contends that because the witnesses were police officers, they should not be evaluated using the same standards for civilians. In support, they emphasizes the following example of "good reason" from the Massachusetts case Commonwealth v. Crayton, cited by our Supreme Court in Watson: "'the witness is an arresting officer who' saw the crime and 'the identification merely confirms that the defendant is the person who was arrested for the' offense"; and "when a witness is already 'familiar with the defendant' from before the crime." 254 N.J. at 583 (quoting 21 N.E. 157, 170 (Mass. 2014)).

In State v. Pressey, the parties presented the Court with "an intriguing question: whether an identification made by a law enforcement officer should be tested by the same standards that apply to a civilian." 232 N.J. 587, 590-91 (2018). Ultimately, the Court concluded:

> Based on the record before us, we cannot determine whether part or all of the protections outlined in Henderson should apply to identifications made by law enforcement officers. We encourage parties in the future to make a record before the trial court, which can be tested at a hearing by both sides and then assessed on appeal.

A-3699-23

[Id. at 592.]

We invite the same here.[2]  On remand, the parties shall follow the procedures outlined in Watson.  If the State files a motion to admit the identifications, the court should determine at a pre-trial hearing whether there is "good reason" for each officer to individually identify defendant at trial.

### ii.

Defendant also contends that Detective Marino's testimony stating that he did not arrest him sooner because it was their hope he could help them get "somebody a little more violent," sent an "unmistakable message to the jury that he was violent."  McDowell contends this violated his rights to due process and a fair trial.  We disagree.

During Detective Marino's testimony, defense counsel asked him if defendant was arrested after either controlled buy.  On re-direct, the prosecutor asked if it was "uncommon to withhold charges after an initial purchase of CDS from a target?"  Detective Marino responded that it was "[v]ery common."  When asked why, he explained, "[b]ecause we're — pending charges to hope

---

[2] Because there was no pre-trial motion, the record is devoid of any information regarding what investigation, if any, was done regarding "Big Rob" or the Mercer Street residence before the controlled buys were executed.  If a search warrant was issued after the controlled buys, the information contained in the affidavit also is not part of the record on appeal.

19

that they will cooperate with us to get somebody, a — a larger drug dealer, maybe somebody a little more violent." There was no objection.

Defendant's assertion that this was improper because it characterized him as "violent" takes the answer out of context and lacks merit. The question at issue was directed at understanding whether it was "common" to withhold charges concerning a target from whom drugs had already been purchased, and Detective Marino explained why it was "very common" to do so. As he explained, sometimes criminal charges against a target may be withheld to give the target a chance to lead the police to "a larger drug dealer" and/or to "somebody a little more violent." To say that this explanation of the general practice of police offered a description of defendant as a violent person completely misreads the exchange. It did nothing of the kind and had no capacity for prejudice.

To the extent we have not addressed any of McDowell's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hadley

Clerk of the Appellate Division

A-3699-23