**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1653-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARWENS H. CADET,

     Defendant-Appellant.

_____

> Argued April 30, 2024 – Decided July 10, 2024
>
> Before Judges Gooden Brown and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 18-07-0396.
>
> Lauren S. Michaels, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Lauren S. Michaels, of counsel and on the briefs).
>
> Kaili E. Matthews, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Kaili E. Matthews, of counsel and on the brief).

PER CURIAM

Defendant was charged in a Union County indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count two); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three). Following a jury trial, defendant was convicted of all three charges. After merger, he was sentenced to forty years in prison, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count one, and a concurrent seven-year term, with a forty-two-month parole disqualifier, on count two.

The convictions stemmed from the fatal shooting of Brian Pierre in a 7-Eleven parking lot in Linden at approximately 10:35 p.m. on April 17, 2018. The evidence tying defendant to the shooting consisted of the murder weapon seized by police from a vehicle defendant and others were about to enter and surveillance footage depicting the shooter wearing distinctive Nike pants similar to the pants defendant wore when he was taken to the Union County Prosecutor's Office (UCPO) for questioning the night of the shooting. In his statement to police, before invoking his right to remain silent, defendant admitted going to the 7-Eleven earlier that evening and seeing Pierre. Although he also admitted that he and Pierre did not get along, he denied any involvement in the shooting.

2

None of the three eyewitnesses produced by the State at trial could identify the shooter, and the forensic and physical evidence largely excluded defendant.

On appeal, defendant raises the following points for our consideration:

POINT I

INTERROGATORS FAILED TO SCRUPULOUSLY HONOR [DEFENDANT'S] INVOCATION OF HIS RIGHT TO SILENCE, INSTEAD EXTRACTING HIS ASSENT TO LEADING QUESTIONS REGARDING THE FAIRNESS OF POLICE TREATMENT OF HIM AND THE VERACITY AND COMPLETENESS OF HIS EARLIER STATEMENTS. THE WRONGFUL ADMISSION OF VIDEO OF [DEFENDANT'S] CONSTITUTIONAL INVOCATION AND POST-INVOCATION STATEMENTS, PARTICULARLY GIVEN THE LACK OF LIMITING INSTRUCTION, REQUIRES REVERSAL.

A. Over Defense Objection, The Entire Interrogation, Including [Defendant's] Invocation and Post-Invocation Questioning, Was Admitted At Trial.

B. [Defendant's] Invocation Of His Right To Silence, As Well As The Post-Invocation Interrogation, Were Inadmissible.

C. The Admission Of [Defendant's] Invocation And Post-Invocation Interrogation Requires Reversal.

POINT II

BECAUSE IDENTIFICATION WAS THE CENTRAL CONTESTED ISSUE AT TRIAL, THE COURT'S INEXPLICABLE FAILURE TO CHARGE THE JURY

3

ON IDENTIFICATION DENIED [DEFENDANT] DUE PROCESS AND A FAIR TRIAL. (NOT RAISED BELOW).

POINT III

THE CUMULATIVE EFFECT OF THESE ERRORS DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT IV

THE SENTENCE OF [FORTY] YEARS, [THIRTY-FOUR] WITHOUT PAROLE, WAS IMPOSED WITHOUT ALLOWING [DEFENDANT] TO EXPLAIN HIS CONCERNS REGARDING HIS ATTORNEY, WAS BASED ON FLAWED FINDINGS OF AGGRAVATING AND MITIGATING FACTORS, AND IS EXCESSIVE.

A.  Resentencing Is Required Because The Court Denied [Defendant] The Opportunity To Address His Concerns With His Lawyer During The Sentencing Hearing, Which Was A Structural Error.

B.  Resentencing Is Also Required Because The Court Erred In Finding And Weighing Aggravating And Mitigating Factors.

POINT V

RESENTENCING IS ALSO REQUIRED BECAUSE ZUBER[1] SHOULD EXTEND TO [EIGHTEEN] YEAR OLDS, LIKE [DEFENDANT], WHO SHARE

---

[1]  State v. Zuber, 227 N.J. 422 (2017).

A-1653-21

THE SAME CHARACTERISTICS AS SLIGHTLY YOUNGER JUVENILES.[2]

Because we agree that the cumulative effect of the errors described in Points I and II deprived defendant of a fair trial, we reverse the convictions, vacate the sentence, and remand for a new trial. Given our decision, we need not address the sentencing arguments.

I.

Following pre-trial motion practice, a seven-day trial was conducted on divers dates between February 12 and February 26, 2020. During the trial, the State produced seventeen witnesses, including civilians, law enforcement personnel, and expert witnesses. Defendant did not testify and produced one witness. We glean these facts from the trial record.

On the evening of April 17, 2018, Pierre and a group of friends, including Marquise Randle and Sean Kelley, were socializing at the 7-Eleven on St. Georges Avenue in Linden. Pierre, who was a party promoter, placed flyers for an upcoming event on the counter near the register with the permission of Carl Clanton, the store clerk. According to Clanton, a second group consisting of two individuals entered the store after Pierre's group left and attempted to

---

[2] The conclusory point headings have been omitted as superfluous.

discard the flyers.  However, Clanton retrieved the flyers and returned them to the counter.

Later that night, Pierre and his friends returned to the store.  As the end of his shift approached, Clanton "shoo[ed] them" out of the store, following behind them "to have a cigarette."  Once outside, Clanton heard "[guns]hots fired." Clanton immediately returned to the store, locked the door, and called the police. Although Clanton did not see the shooter, he testified that the shooter was wearing "a hoodie."

The store's surveillance footage, which was played for the jury, depicted the shooter wearing a two-toned jacket with a hood, and dark pants with a light stripe down the leg.  In the footage, as the group exited, the shooter approached them from behind a dumpster in the store's parking lot, shot at one individual, followed him, and continued to shoot at him as he fell between two parked cars. After firing multiple shots, the shooter fled on foot towards the road.  The twenty-nine-second black and white footage was time stamped 10:34 p.m.

Randle and Kelley exited the 7-Eleven into the parking lot with Pierre. When the shooting started, each ran away in a different direction.  Both men testified at trial that they never saw the shooter.  After the shooting stopped,

A-1653-21

Randle returned and saw Pierre "on the ground."  By that time, police had arrived at the scene.

Roselle Police Officer Anthony Bracey was the first officer to arrive at the 7-Eleven.  Upon finding Pierre unresponsive and "laying in the middle of the parking lot face down," he immediately advised "dispatch to notify . . . emergency units to [his] location."  Once the paramedics arrived, Pierre was transported to Trinitas Regional Medical Center where he succumbed to his injuries.  A subsequent autopsy revealed four gunshot wounds, one to the head and three to the torso.  Four bullets were recovered and the death was ruled a homicide.

Among the officers who responded to the scene was Roselle Police Officer Jaquan Spruill.  Spruill canvassed the surrounding area, including the garden apartments across the street from the 7-Eleven called the Oak Park apartment complex located at Three Garden Drive.  Spruill encountered three men walking along the sidewalk of the apartment complex parking lot and ordered them to stop.  Two of the men, later identified as Jahmer and Jaivon Bethea,[3] complied and stopped near the front and rear driver's side, respectively, of "a red Chevy

---

[3]  The Betheas are brothers whom we will refer to throughout the opinion by first names to avoid confusion.  We intend no disrespect.

Impala." Before stopping, the men were "attempting to enter the vehicle." The third individual, later identified as defendant, stood by "the front passenger side of the vehicle" where Spruill's vision was partially obscured. Spruill therefore directed defendant "to come back to the rear trunk of the vehicle." All four men then awaited the arrival of backup officers.

Once backup officers arrived, Spruill questioned the three men about their "whereabouts," obtained their pedigree information, and frisked them for weapons with negative results. After their accounts were verified, the three men were allowed to leave. However, instead of entering the Impala, the three men told Spruill "they were going back into th[e] apartment building." Spruill noted that defendant was wearing a "red-hooded sweatshirt" at the time.

Surveillance footage from the area captured the police encounter and was played during the trial. After the three men left, Spruill continued to investigate the area and observed in plain view "a black revolver handgun on the . . . passenger side floor" of the red Chevy Impala. Once the handgun was observed, the other investigating officers were promptly notified of the discovery.

Prior to Spruill's discovery, in the course of the investigation, Sergeant Carmen Olivera had questioned Rahmile Raynor, an occupant of apartment

8

number 3D at the Oak Park apartment complex. An individual by the name of Keon Orr was also in the apartment at the time. After Spruill observed the handgun in the Impala, he and other officers went to apartment 3D where defendant, Jahmer, Jaivon, Raynor, and Orr were located. All five men were transported to the UCPO for questioning. According to Spruill, defendant was "no longer wearing [the] red-hooded sweatshirt" worn during the initial stop but was wearing "the same pants."

Crime Scene Unit Investigator Andrew Carew processed apartment 3D and collected "a two-toned jacket" and "a red-hooded sweatshirt" from the couch. Inside the jacket pocket was a birth certificate for Keon Orr and a wallet containing multiple identification cards with Orr's name. Carew also located a flyer on the "coffee table" in the living room. The flyer was one of the flyers that had been left on the counter at the 7-Eleven. Additionally, Carew processed the red Impala, that was registered to Jahmer, as well as the crime scene. He collected soil samples by the dumpster in the 7-Eleven parking lot. Carew also collected defendant's clothing, which included "Nike pants with the white stripe" and black "Nike Jordan sneaker[s]."

Defendant's interrogation at the UCPO began at approximately 2:20 a.m. on April 18, 2018. A video recording of the interrogation was played for the

A-1653-21

jury.  Initially, defendant was administered Miranda[4] warnings by UCPO Sergeant Johnny Ho.  After acknowledging that he understood his rights, defendant agreed to give a statement and signed a form acknowledging the waiver of his rights.  Then, in response to investigators' questions, defendant stated that he was eighteen years old, explained that he "live[d] with [his] friend . . . Raynor" at the Oak Park apartment complex, and provided his cellphone number.

When asked about his whereabouts on April 17, defendant informed investigators that he had traveled from South River to Raynor's apartment in Jahmer's red Chevy Impala.  According to defendant, Jahmer drove while Jaivon and defendant sat in the back seat.  When they arrived, Raynor was not home but Orr was there.  Raynor arrived after defendant, Jahmer, Jaivon, and Orr began playing video games.

Defendant confirmed that he had been wearing "[b]lack and white" Nike pants with "stripes going down" "the sides," Nike Jordan sneakers, and a "True Religion" "red hoodie," "[t]he same one" he was wearing when he had been stopped by Spruill.  He explained that the red hoodie was still on the couch at the apartment.  When asked whether he had left the apartment at any time,

---

[4]  Miranda v. Arizona, 384 U.S. 436 (1966).

defendant responded that he had "left the apartment," "went out to 7-Eleven," and "[t]hen came back." Defendant said "[he] didn't buy anything" at the 7-Eleven "because when [he] went there, [he] seen some people . . . [he] don't associate with" and thought he was going to "get jumped." According to defendant, he returned to the apartment, warned the others, and started playing video games. About thirty minutes later, when he, Jahmer, and Jaivon were about to return to South River, they were stopped by Spruill. After they were released, they returned to the apartment.

When questioned further about going into the 7-Eleven, defendant explained that "[t]here[ was] a group of people shelling out flyers." Defendant stated that "one person" in particular, whom he identified by his street name, "Kraft," was "in the aisle passing out flyers" to "some music thing." Defendant said "[he] don't mess with" Kraft. Fearing that Kraft was "probably gonna try and jump [him]," defendant left the 7-Eleven, "hopped in the Impala" that was parked out front, and returned to the apartment where he warned the others to not "leave th[e] house." "Kraft" was Pierre's street name.

When investigators pressed defendant for details about what occurred in the 7-Eleven parking lot after Pierre exited the store, defendant invoked his right to silence in the following exchange:

11

[SERGEANT HO]: Did anything happen between you and anybody else outside in the parking lot?

[DEFENDANT]: Nah.

[SERGEANT HO]: You sure?

[DEFENDANT]: I'm positive.

[SERGEANT HO]: Okay. Um, are you sure?

[DEFENDANT]: I'm positive. Nothing happened in the parking lot. I hopped in the Impala and dipped off.

[SERGEANT HO]: Something happened in the parking lot and as a result of that somebody ended up in the hospital. It's best for you to tell us what happened.

[DEFENDANT]: I told you I don't know what happened.

[SERGEANT HO]: Something happened in the parking lot.

[DEFENDANT]: I don't wanna talk (inaudible).

[SERGEANT HO]: You don't wanna talk anymore?

[DEFENDANT]: Nah.

[SERGEANT HO]: No; okay. Did we threaten you in any way?

[DEFENDANT]: Nah.

[SERGEANT HO]: You have any complaints as to how you were treated today?

12

A-1653-21

[DEFENDANT]: Nah.

[SERGEANT HO]: Okay. We're . . .

[DEFENDANT]: Yeah, you . . .

[SERGEANT HO]: How did we treat you today?

[DEFENDANT]: Everything was fair. Reasonable.

[SERGEANT HO]: Okay. Fair enough. You swear that everything you told us is the truth, the whole truth, and nothing but the truth?

[DEFENDANT]: Yes.

[SERGEANT HO]: All right. Thank you.

[(Emphasis added).]

The handgun recovered from the Impala was subsequently tested by Union County Police Department Lieutenant Michael Sandford, who was qualified as an expert in the field of forensic firearm identification. Sandford determined that "the firearm [was] operable" and opined that the four projectiles collected during the investigation were fired from the firearm. The gun was also analyzed for fingerprint comparisons by Crime Scene Unit Sergeant Adrian Gardner, who was qualified as an expert in the area of pattern evidence examination. Gardner testified that although the print taken from "the frame of the firearm" had "enough features to be compared" to defendant's known prints, her "findings

13

were inconclusive." However, a comparison of a latent print taken from "the adhesive side of the tape" that was "removed from the grip" of the gun "excluded" defendant "as the source of th[e] impression."[5]

The State's DNA expert, Forensic Scientist Frank Basile, testified that he examined "swabbings" from the firearm's "cylinder," "hammer," "grip," "frame," and "trigger" for traces of DNA. Of all the surfaces, Basile was only able to conduct DNA comparisons on the "cylinder pin." According to Basile, the "genetic information" obtained from the cylinder pin was a mixture, indicating at least two individuals contributed to the DNA. Basile tested the genetic information from the cylinder pin against buccal swabs from both defendant and Jaivon. He testified that Jaivon could not be excluded as "a possible contributor" to the mixture of DNA, but defendant was specifically "excluded as being a possible contributor."

The State also produced Federal Bureau of Investigation Forensic Examiner Ian Saginor, who was qualified as an expert geologist forensic examiner. Saginor compared the soil collected from defendant's shoes with soil samples collected from the parking lot of the 7-Eleven and determined that the

---

[5] The parties stipulated that defendant was not licensed by the State to own or carry a firearm.

soil samples did not match. Saginor attributed the results to several possibilities, including that "the shoes[] were not present at th[e] location," that the shoes were "present[] but . . . no . . . soil[] . . . transferred" to the shoes, or that the soil "was transferred" to the shoes but "later fell off." Sergeant Gardner had also compared "three footwear impressions" collected from the crime scene to defendant's Nike Air Jordan sneakers. She concluded that although "there was an association of class characteristics," it "lacked any individual characteristics" to "reach an identification decision."

Finally, the State produced UCPO Detective Nicholas Falcicchio, who was qualified as an expert in historical cell site analysis. Falcicchio analyzed a phone number provided by defendant during the police interrogation and concluded that "the general location of the device" between 4:00 p.m. and 5:00 p.m. on April 17, 2018, was South River. Falcicchio further testified that at 8:27 p.m. on April 17, an incoming call was received on that phone "in the vicinity of South River," and at 9:24 p.m., an outgoing call was placed while "the device [was] in the Roselle general area." Additionally, a 10:26 p.m. incoming call showed the device was still located in the Roselle area.

After the State rested, defendant moved for judgment of acquittal pursuant to Rule 3:18-1, which motion was denied by the trial judge. After the jury

returned a verdict of guilty on all counts, defendant was sentenced on January 15, 2021, and an amended conforming judgment of conviction was entered on January 22, 2021. This appeal followed.

II.

In Point I, defendant argues it was error for the judge to permit the playing before the jury of his invocation of his right to remain silent as well as "the portion of the statement made after police failed to honor [his] right to silence." According to defendant, the error was compounded by the judge's failure "to provide a limiting instruction." Defendant asserts that "given the nature of the State's circumstantial case, . . . the erroneous inclusion of the invocation and statements thereafter violated [his] rights against self-incrimination, and to due process and a fair trial, requiring reversal."

In State v. Clark, 251 N.J. 266 (2022), our Supreme Court articulated the principles governing a defendant's right against self-incrimination under the Fifth Amendment and our common law as follows:

> The Fifth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment, see State in Int. of A.A., 240 N.J. 341, 351 (2020), guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V. Although not included in the New Jersey Constitution, the right against self-incrimination is deeply rooted in

New Jersey common law and is codified by statute and the Rules of Evidence. See N.J.S.A. 2A:84A-19; N.J.R.E. 503.

In Miranda v. Arizona, the United States Supreme Court held that individuals who are "subjected to police interrogation while in custody . . . or otherwise deprived of [their] freedom of action in any significant way" must be appropriately advised of certain rights so as to not offend the right against self-incrimination. 384 U.S. at 477-79. Miranda warnings include advice as to the right to remain silent and of the right to the presence of an attorney during any questioning. Id. at 479. Pursuant to Miranda, if an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74. Furthermore, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

[Clark, 251 N.J. at 291-92 (alterations and omissions in original).]

Harkening back to State v. Feaster, 156 N.J. 1 (1998), the Clark Court reaffirmed that in situations where a suspect waives his or her Miranda rights and agrees to speak to law enforcement, but later invokes his or her rights during the interrogation, "'trial courts should endeavor to excise any reference to a criminal defendant's invocation . . .' from the statement that the jury hears." Clark, 251 N.J. at 292 (quoting Feaster, 156 N.J. at 75-76). However, "'[a] trial court's failure to follow the Feaster stricture of excision or a cautionary

instruction does not necessarily equate to reversible or plain error'; rather, a harmful error analysis is warranted to determine whether the defendant was deprived of a fair trial." Ibid. (quoting State v. Tung, 460 N.J. Super. 75, 94-95 (App. Div. 2019)).

As such, in Feaster, the Court found no reversible error where the defendant's statement to an investigator, that included his invocation of his right to counsel, was admitted at trial over defense counsel's objection. 156 N.J. at 73-74, 77. The invocation was permitted to explain how the interview ended. Id. at 74. Although the Court determined that the trial court "should have provided a cautionary instruction to prevent the jury from drawing any unfavorable inferences against defendant's invocation of his right to counsel,"

> [n]onetheless, [it] conclude[d] that the trial court's actions did not amount to reversible error. First, [the Court] note[d] the fleeting nature of the reference to defendant's invocation of his right to counsel. Additionally, the prosecutor did not comment on the matter during summation. Moreover, the [trial] court provided an emphatic instruction to the jury that it not in any way hold defendant's failure to testify against him. Although that instruction did not relate directly to defendant's invocation of his right to counsel, it did impart to the jury the respect to be accorded defendant's decision to remain silent. The convergence of those factors, in addition to defendant's failure to request a cautionary instruction, persuade[d] [the Court] that this jury was unlikely to have drawn any unfavorable

inferences against defendant that jeopardized his fundamental right to a fair trial.

[Id. at 76-77.]

In contrast, in Clark, the Court overturned a murder conviction because it determined it was plain error "to play for the jury" the portion of the defendant's statement to the detective where the defendant "invoked his right to counsel" but the detective "continued questioning him." 251 N.J. at 293-94. According to the Court, although the forty-one minutes of questioning prior to the invocation was clearly admissible, instead of ending the interview after the defendant invoked his right to counsel, the detective "continued to press defendant about his alibi." Id. at 294. The Court explained that the "error was further emphasized by the prosecutor's comments in summation" that the detective "'practically begged' defendant for information on his alibi." Id. at 294-95. The Court concluded that "[g]iven the State's circumstantial case, allowing all that to go before the jury was clearly capable of producing an unjust result," particularly since the statement was played for the jury not once, but twice— once during the trial and once during deliberations. Ibid.

Similarly, in Tung, 460 N.J. at 94-95, we held that allowing the jury to hear the two instances of defendant's invocation of counsel constituted plain error. We determined the error, along with others, cumulatively "deprived

19

defendant of a fair trial," requiring the reversal of his murder and related convictions.  Id. at 104.  We reasoned:

> Here, the trial court neither excised the two references in the record to defendant invoking his right to counsel to end the interrogation, nor provided a cautionary instruction following a determination that inclusion of the references was necessary to avoid juror confusion.  Given the longstanding standard of Feaster and the constitutional dimension of defendant's right to counsel, the trial court should have addressed this issue regardless of whether defense counsel objected.  Standing alone, these references without a cautionary instruction might not constitute plain error.  Combined with other errors, however, they had the clear capacity to undermine the verdict.

> [Tung, 460 N.J. Super. at 94-95.]

Although Feaster, Clark, and Tung concerned the right to counsel, our Supreme Court has previously explained that under our case law, a violation of either the right to counsel or the right to silence is treated the same for purposes of a constitutional violation.  State v. Hartley, 103 N.J. 252, 277 (1986).  Indeed, "a failure scrupulously to honor an asserted right to silence is as much a constitutional violation as is a failure to honor a previously-invoked right to counsel."  Ibid.  The Court "has reaffirmed time and time again that '[t]he privilege against self-incrimination . . . is one of the most important protections of the criminal law,' and has afforded the state privilege broader protection than

its Fifth Amendment counterpart." Clark, 251 N.J. at 292 (alteration and omission in original) (citation omitted) (quoting State v. Presha, 163 N.J. 304, 312 (2000)).

Here, the admissibility of defendant's recorded statement was decided by a different judge following a pre-trial Miranda hearing during which Sergeant Ho testified consistent with his trial testimony. After the hearing, the judge credited Ho's testimony and determined that "the State ha[d] met its burden to . . . prove beyond a reasonable doubt that [defendant] waived his rights knowingly, intelligently[,] and voluntarily," and "proceeded to give a [voluntary] statement." Accordingly, the motion judge concluded that the statement would be admitted at trial.

On appeal, defendant does not challenge the judge's substantive ruling that the pre-invocation portion of his statement was admissible. Instead, defendant contends his invocation of his right to remain silent and the subsequent questioning by investigators regarding his treatment and the truthfulness of his statement should have been excised before the statement was played for the jury. However, as the State points out, defendant did not expressly object to the admission of the invocation nor the subsequent questioning. Likewise, defendant did not object to the judge's failure to give a cautionary instruction.

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, we may nonetheless consider whether it rises to the level of plain error under Rule 2:10-2. See Clark, 251 N.J. at 286-87.

Plain error "is a 'high bar,' requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Alessi, 240 N.J. 501, 527 (2020) (citations omitted) (first quoting State v. Santamaria, 236 N.J. 390, 404 (2019); and then quoting State v. Macon, 57 N.J. 325, 336 (1971)). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" Santamaria, 236 N.J. at 404 (quoting State v. Bueso, 225 N.J. 193, 203 (2016)).

"The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389-90 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)); see also State v. Dunbrack, 245 N.J. 531, 544 (2021) ("The plain error standard requires a twofold determination: (1) whether there was error; and (2) whether that error

was 'clearly capable of producing an unjust result.'" (quoting R. 2:10-2)). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'" Clark, 251 N.J. at 287 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

Here, defendant gave a voluntary statement after waiving his Miranda rights. Defendant's recorded statement, including his invocation and the subsequent questioning, was played twice for the jury—once during Ho's trial testimony and a second time during deliberations in response to jury questions. Further, although defendant and the State have divergent views on the characterization of the evidence in the case as "circumstantial," no eyewitness identified defendant as the shooter, the surveillance video footage does not clearly identify the shooter, and the forensic and physical evidence largely excluded defendant or incriminated others.

We agree with defendant that admission of his invocation and the subsequent questioning was clearly error. The question is whether the error was "clearly capable of producing an unjust result," R. 2:10-2, to rise to the level of plain error. We acknowledge that the prosecuting attorney did not refer to defendant's invocation of silence or the subsequent questioning by direct or indirect comment. Cf. Clark, 251 N.J. at 279, 281-82. We also note that while

23

not directly related to defendant's invocation, as in Feaster, the judge instructed the jury to not consider defendant's decision to remain silent and not testify at trial.

Nonetheless, because the State's proofs were entirely circumstantial, no eyewitness identified defendant as the shooter, and misidentification was central to the defense, we are convinced that, in conjunction with the judge's failure to give an identification instruction, which we will discuss next, it is likely and reasonable that "'the error led the jury to a result it otherwise might not have reached.'" G.E.P., 243 N.J. at 390 (quoting Jordan, 147 N.J. at 422).

In Point II, defendant argues for the first time on appeal that the judge erred in omitting the identification instructions applicable when there is no in- or out-of-court identification offered because "[t]he key issue in th[e] case was identification." Without the proper instructions, defendant submits "the State's burden of proof" was "lessen[ed]," defendant's "right to present a defense" was "diminish[ed]," and defendant was "denied his rights to due process and a fair trial." Because defendant did not object to the omission of the charge, we again review for plain error.

In the context of a jury charge, "'plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of

the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'"' State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Certain jury instructions are so crucial to a jury's deliberations that error is presumed to be reversible. State v. McKinney, 223 N.J. 475, 495 (2015). "An erroneous jury charge 'when the subject matter is fundamental and essential or is substantially material' is almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (quoting State v. Green, 86 N.J. 281, 291 (1981)).

In State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003), we summarized the importance of an identification charge as follows:

> The seminal decision on the need for identification instructions is [State v. Green]. There, the court stated that a request for jury instructions shall be granted when those instructions relate to "essential and fundamental issues and those dealing with substantially material points." Id. at 290; accord State v. Robinson, 165 N.J. 32, 40 (2000); State v. Cromedy, 158 N.J. 112, 128 (1999). And because a defendant may "justifiably assume that fundamental matters will be covered in the charge," Green, 86 N.J. at 288, the failure to give such an instruction, even when not requested, may constitute reversible error. [State v. Pierce, 330 N.J. Super. 479, 487-90 (App. Div. 2000)]. While it is possible that the corroborative evidence against a defendant may be sufficiently strong that the failure to give an identification instruction does not constitute plain

error, State v. Salaam, 225 N.J. Super. 66, 70 (App. Div. 1988), as a matter of general procedure a model identification charge should be given in every case in which identification is a legitimate issue. State v. Copling, 326 N.J. Super. 417, 434 (App. Div. 1999), certif. denied, 164 N.J. 189 (2000); State v. Gaskin, 325 N.J. Super. 563, 573 (App. Div. 1999), certif. denied, 164 N.J. 190 (2000). The failure to give such a charge or to give an adequate charge is most often reversible error. [Pierce, 330 N.J. Super. at 487-90]; State v. Malloy, 324 N.J. Super. 525 (App. Div. 1999); State v. McNeil, 303 N.J. Super. 266 (App. Div. 1997); State v. Frey, 194 N.J. Super. 326 (App. Div. 1984). While in some instances it may not be necessary to present an extended charge on identification, nevertheless, the complete absence of any reference to identification as an issue or as an essential element of the State's case is improper.

"Identification becomes a key issue when '[i]t [is] the major . . . thrust of the defense,' particularly in cases where the State relies on a single victim-eyewitness." State v. Cotto, 182 N.J. 316, 325 (2005) (alterations and omission in original) (citations omitted) (quoting Green, 86 N.J. at 291); see also Frey, 194 N.J. Super. at 329 ("The absence of any eyewitness other than the victim and defendant's denial of guilt, made it essential for the court to instruct the jury on identification.").

In Davis, the defendant was convicted of drug possession and distribution related charges. 363 N.J. Super. at 558. "Although the trial court gave general instructions on such things as credibility and the elements of the crimes charged,

there was no specific instruction on the State's burden to prove identification beyond a reasonable doubt" despite the "defense's claim of misidentification." Id. at 561. On appeal, the defendant challenged "the trial court's failure to instruct the jury on identification." Id. at 559. We determined the omission constituted plain error and reversed, concluding that even though "[a]n extended instruction on identification was not necessary on the . . . facts," the "complete absence of any reference to identification as an issue or as an essential element of the State's case [was] improper." Id. at 561-62. We explained that although the defense's claim of misidentification was "thin," it "was not specious." Id. at 561. Further, "[a] jury is at liberty to reject a meritless defense, but trial courts are not at liberty to withhold an instruction, particularly when that instruction addresses the sole basis for defendant's claim of innocence and it goes to an essential element of the State's case." Id. at 561-62.

In Cotto, the trial court failed to mention "identification" in its jury instructions, despite misidentification being an issue and a defense in the defendant's trial on robbery, burglary, and related charges. 182 N.J. at 322, 326-27. Although the Cotto Court determined that "identification was a 'key issue,'" id. at 326 (citing Green, 86 N.J. at 291), it concluded that the trial court's instructions to the jury did not constitute plain error despite lacking "the word

'identification,'" id. at 327. The Court explained that "[t]he determination of plain error depends on the strength and quality of the State's corroborative evidence rather than on whether defendant's misidentification argument is convincing." Id. at 326.

The Court reasoned that

> despite the trial court's failure to provide a detailed identification instruction, the trial court did specifically explain to the jury that the State bears the burden of proving beyond a reasonable doubt "each and every element of the offense, including that of the defendant's presence at the scene of the crime and his participation in the crime."
>
> [Ibid.]

Therefore, given the State's "significant corroborating evidence," as well as the fact that the jury was instructed that "the State bears the burden of proving beyond a reasonable doubt that the defendant is the wrongdoer," the Cotto Court found no plain error in the less detailed instruction given at trial. Id. at 327.

Here, although the judge's instructions repeatedly referenced the State's burden to prove its case or the specific elements of the crimes charged "beyond a reasonable doubt," like Davis, there was no mention of the State's burden to prove identity beyond a reasonable doubt. As defendant points out, the judge did not provide the following Model Jury Charge:

(Defendant), as part of his/her general denial of guilt, contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that he/she is the person who committed the alleged offense. The burden of proving the identity of the person who committed the crime is upon the State. For you to find this defendant guilty, the State must prove beyond a reasonable doubt that this defendant is the person who committed the crime. The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else, or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that this defendant is the person who committed it.

[Model Jury Charges (Criminal), "Identification: No In- or Out-Of-Court Identification" (approved Oct. 26, 2015).]

In Clark, our Supreme Court specified that an identification charge "should be given to the jury on remand." 251 N.J. at 288-89. The Court pointed out that "although the trial court's failure to give the charge, standing alone, did not 'possess[ ] a clear capacity to bring about an unjust result,' the charge should be given on remand because this is a case in which there was no identification by any witnesses." Ibid. (alteration in original) (citation omitted) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

29

Similarly, here, although we may not have been convinced that the omission of the identification charge, standing alone, rises to the level of plain error, in conjunction with the erroneous admission of defendant's invocation of his right to silence and the ensuing questioning, we believe that reversal of the convictions is warranted. "We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). Such is the case here.

"Our obligation is to ensure that defendant had a fair trial . . . ." Ibid. "When assessing whether defendant has received a fair trial, we must consider the impact of trial error on defendant's ability fairly to present his defense . . . ." Ibid. Here, "[w]e hold that the errors' cumulative impact prejudiced the fairness of defendant's trial and, therefore, casts doubt on the propriety of the jury verdict that was the product of that trial." Id. at 474. Accordingly, we reverse the convictions, vacate the sentence, and remand for a new trial. Based on our decision, we need not address defendant's remaining arguments.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION